[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 8, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13276

_____

D.C. Docket No. 05-60012-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEONARD SCOTT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 8, 2006)**

Before ANDERSON, FAY and SILER[*], Circuit Judges.

_____

[*] The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

SILER, Circuit Judge:

Defendant Leonard Scott pled guilty to illegal reentry into the United States after having been previously deported in violation of 8 U.S.C. § 1326. At sentencing, the district court added one criminal history point to Scott's criminal history calculation in accord with USSG § 4A1.1(e). Scott contends that this addition was in error. For the following reasons, we vacate the sentence and remand the case for resentencing.

## BACKGROUND

Scott was deported from the United States in 1991 and, having never submitted an application requesting reentry, illegally reentered the United States in 1994 under the name of Michael Anderson. In 1999, Scott was convicted in Broward County, Florida state court of two counts of possession of cocaine. In February of that year, he received a probationary sentence after pleading guilty to both counts. Sometime in the intervening period, Scott violated the terms of his probation and an arrest warrant was issued. On August 25, 2004, Scott was arrested in Lee County, Florida, on this arrest warrant. At this time, Scott was still using the alias Michael Anderson and he was jailed under that name. That same day Scott was interviewed by Bureau of Immigration and Customs Enforcement ("ICE") Agent Sean Mullin in the Lee

County jail. Scott gave Agent Mullin his true name, advised him that he had entered the country illegally, and provided the agent with details about his previous deportation and illegal reentry.

Scott was then transferred to the Broward County jail and, on September 15, 2004, a Broward County court revoked Scott's probation on the previous cocaine possession charges and sentenced Scott to 180 days' imprisonment. While serving this sentence in the Broward County jail, Broward County authorities discovered that Scott's fingerprints (Scott was still interned in Florida under the name of Michael Anderson) matched those of an individual named Leonard Scott who had previously been deported from the United States. The Broward County authorities contacted ICE with this information on January 4, 2005. The following day ICE Agent Sammy Cruzcoriano visited the jail and interviewed Scott. Scott "gave a full confession" – admitting his real name, stating that he had been previously deported, and that he had illegally reentered the United States using a fraudulent passport. Later that day, the FBI matched fingerprints taken that day by Agent Cruzcoriano with the fingerprints on file from Scott's deportation in 1991. Agent Cruzcoriano reviewed Scott's alien file and confirmed his identity.

On January 6, 2005, an arrest warrant was issued for Scott on immigration violations and a federal grand jury returned an indictment on January 18 charging

Scott with illegally reentering the United States in violation of 8 U.S.C. § 1326. Scott pled guilty to that charge on March 18, 2005. After calculating Scott's Sentencing Guidelines range as 30-37 months, the district court sentenced him to 26 months' imprisonment, giving Scott four months' credit for time served between his initial interview with Agent Mullin and the return of the federal indictment in January. Scott timely appealed his sentence to this court.

## DISCUSSION

Scott argues that the district court improperly calculated his criminal history points under the Sentencing Guidelines by erroneously adding one point pursuant to USSG § 4A1.1(e) for committing the instant offense while under a sentence of imprisonment of at least sixty days. This error, he claims, was significant because it increased his total criminal history points to ten and thereby placed him in criminal history category V, resulting in a sentencing range of 30 to 37 months' imprisonment. Without the disputed criminal history point, Scott would have had only nine criminal history points, placing him in criminal history category IV and a sentencing range of 24-30 months.

In determining the criminal history category of a defendant, USSG § 4A1.1(e) provides:

4

> Add 2 points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) [a sentence exceeding 13 months] or (b) [a sentence of at least 60 days] or while in imprisonment or escape status on such a sentence. If 2 points are added for item (d), add only 1 point for this item.

In this case, the district court found that Scott had committed the charged illegal reentry offense while he was serving a 180-day sentence for a probation violation and therefore the district court added, over Scott's objections, one criminal history point to the Guidelines calculation.[1] Scott argues that the addition of the criminal history point under § 4A1.1(e) was an error because he did not begin serving the 180-day sentence until after his violation of 8 U.S.C. § 1326 was complete.

"The district court's interpretation of the sentencing guidelines is subject to de novo review on appeal, while its factual findings must be accepted unless clearly erroneous." *United States v. Jordi*, 418 F.3d 1212, 1214 (11th Cir. 2005) (internal quotations and citations omitted).

An alien is guilty of illegal reentry if he has been previously deported from the United States and thereafter "enters, attempts to enter, or is at any time found in, the United States." 8 U.S.C. § 1326(a)(2). Scott was indicted and convicted of being an alien who, "having been previously deported from the United States on or about April

---

[1]As this offense had already been counted under USSG § 4A1.1(d) (since Scott committed the instant offense while on probation), the district court added only one point pursuant to the last sentence of § 4A1.1(e).

18, 1991, was found in the United States, knowingly and unlawfully" in violation of § 1326. The issue before us focuses squarely upon the meaning of the phrase "found in." To properly assess Scott one criminal history point under § 4A1.1(e), he must have been "found in" the United States only after he began serving the 180-day sentence. In other words, if Scott cannot be considered to have been found at any time after September 15, 2004 (the date the 180-day sentence was handed down), then the assessment is inappropriate since the illegal reentry offense would have been completed on that date and that offense would have been committed before Scott began serving his sentence. Therefore, we must determine when Scott's crime of illegal reentry was completed – meaning when was he "found in" the United States.

We have discussed the meaning of the "found in" language of § 1326 previously. In *United States v. Coeur*, 196 F.3d 1344 (11th Cir. 1999), we noted that we had previously "held that the crime of being 'found in' the United States commences when the alien enters the United States and is not completed until the defendant's arrest." *Id.* at 1346 (citing *United States v. Castrillon-Gonzalez*, 77 F.3d 403, 406 (11th Cir. 1996)). The *Coeur* court went on to cite with approval a Fifth Circuit decision holding that "a previously deported alien is 'found in' the United States when his physical presence is discovered and noted by the immigration authorities." *Id.* (quoting *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th

Cir. 1996)) (internal quotations omitted). Ultimately, the *Coeur* court found that the defendant in that case warranted a two-point assessment under USSG § 4A.1(d) since he was in jail when Immigration and Naturalization Services officials discovered his presence. *Id.* This decision was clarified in *United States v. Clarke*, 312 F.3d 1343 (11th Cir. 2002), when we stated that the "'found in' [language] contained in § 1326 refers to the actions of federal immigration officials, not those of state law enforcement officials." *Id.* at 1348. There is also language in *Clarke* noting that other circuits have held immigration officials to a constructive knowledge standard. *Clarke* stated that, in other circuits, a defendant may be considered "found" when government authorities, "with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of the defendant's presence." *Id.* at 1346 (internal quotations and citations omitted). In fact, *Clarke* went on to conduct a constructive knowledge inquiry and, in finding that the federal government had no reason to know of the defendant's presence, distinguished the cases presented by the defendant by noting that immigration authorities in those cases "had information that, through the exercise of diligence typical of law enforcement authorities, could have led to the discovery of the defendant's illegal presence." *Id.* at 1348 n.4 (distinguishing *United States v. Gomez*, 38 F.3d 1031 (8th Cir. 1994), and *United States v. DiSantillo*, 615 F.2d 128 (3d Cir. 1980)).

7

The government correctly states that a violation of § 1326 is a continuing offense that can run over a long period of time, as the offense conduct begins when the alien illegally enters the United States and continues until the alien is actually "found" by immigration authorities. *See Coeur*, 196 F.3d at 1346. However, the question here deals with when an alien is deemed to be "found" by immigration authorities under § 1326 and is an issue that has never been squarely decided in this circuit. Following the language in *Clarke*, we hold that an alien is constructively "found in" the United States when the government either knows of or, "with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of the defendant's presence." 312 F.3d at 1346 (citing *United States v. Herrera-Ordones*, 190 F.3d 504, 510-11 (7th Cir. 1999); *United States v. Bencomo Castillo*, 176 F.3d 1300, 1303 (10th Cir. 1999); *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996); *United States v. Moses*, 148 F.3d 277, 282 (2d Cir. 1995)) (internal quotations omitted).

The government claims that Agent Mullin's interview of Scott on August 25 was merely a preliminary step in the investigation into Scott's identity and immigration status, and that

> [a]dditional investigative measures – [such as] obtaining Scott's ICE alien file, obtaining his fingerprints, comparing his fingerprints to the fingerprints taken from the Leonard Scott who had been deported from

8

the United States in 1991 – were required before a valid determination could be made concerning both Scott's identity and the legality of his presence in the United States.

The entire investigation, they claim, was not completed until January 5. Any constructive knowledge standard must give immigration authorities adequate time to investigate and confirm the identity of individuals before them. Therefore, had a government investigation into Scott's identity conducted "with the exercise of diligence typical of law enforcement authorities" actually taken the entire four months, then Scott would be deemed "found in" the United States only at the completion of that investigation.

However, the record suggests that the government's claims of an ongoing investigation are incorrect. The Presentence Investigation Report ("PSR"), whose reasoning the district court adopted, simply states that the criminal history point applies since Scott was discovered by immigration authorities on January 5 and was serving a sentence at that time. It contains no reference to the August 25 interview. In fact, the description of the offense conduct in the PSR makes no reference to the events of August 25 and, indeed, reads as if immigration authorities' first notice of Scott's presence in the United States began on January 4 with the call from the Broward County jail. Neither the government's factual basis for the defendant's

guilty plea,[2] given at the change of plea hearing, nor the PSR mention the August 25 interview by Agent Mullin. Moreover, the statement obtained from Scott by Agent Cruzcoriano on January 5 contains no reference to the August interview. The fact that the January 5 interview contains no reference to anything from the August 25 interview significantly detracts from the government's argument that Agent Cruzcoriano's interview was simply a follow-up to the interview by Agent Mullin.

In the end, a review of the record suggests that Agent Mullin's August interview and Agent Cruzcoriano's January interview were completely unrelated. The most likely scenario appears to be as follows: the information gathered during Agent Mullin's interview with Scott was either set aside or lost and immigration authorities forgot about Scott. The call from Broward County about the fingerprint match refocused attention on Scott and ICE rediscovered his case. This time, they followed through on the initial investigation by Agent Cruzcoriano and Scott was quickly prosecuted.

Based upon this reading of the facts, it is only fair to hold that Scott was constructively "found in" the United States during his August 25 interview. To do otherwise would penalize Scott for a delay that was no fault of his own. During his

---

[2]"[T]he government would show . . . that on or about January 4th, 2005, United States Customs . . . received a call from the Broward County Jail. That call involved [the fingerprint match]" and the interview with Agent Cruzcoriano followed.

August 25 interview, Scott was completely honest with Agent Mullin (stating his real name, the alias he was then operating under, his correct personal information, confessing his illegal reentry and presence in the United States, detailing the prior date of his deportation, and detailing how he illegally reentered the country) and the government does not claim that Scott withheld any material information. It appears that immigration authorities simply lost track of Scott in August and, only upon notification of the fingerprint match, restarted their investigation. This is a case where "government authorities, with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of the defendant's presence." *Clarke*, 312 F.3d at 1346 (internal quotations and citations omitted).

Accordingly, Scott should be considered "found in" the United States for purposes of 8 U.S.C. § 1326 on August 25, 2004. At this time, he was neither under a sentence of imprisonment of at least 60 days nor was he less than two years removed from such a sentence. Therefore, the district court improperly applied USSG § 4A1.1(e) when it added one point to his criminal history calculation under that provision. For this reason, we **VACATE** Scott's sentence and **REMAND** to the district court for resentencing.