[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 24, 2009
THOMAS K. KAHN
CLERK

No. 08-13771
Non-Argument Calendar

_____

D. C. Docket No. 07-00136-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO U. AKEL,
a.k.a. Tony Akel,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 24, 2009)

Before HULL, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Antonio Akel appeals his conviction and 480-month sentence for conspiracy to possess with intent to distribute 500 or more grams of cocaine, methylenedioxymethamphetimine hydrochloride ("MDMA"), and marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(B)(ii), (b)(1)(D), and 846, ("Counts 1"); possession with intent to distribute 500 or more grams of cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii), and (b)(1)(D), (Count 2"); distribution of cocaine and MDMA, in violation of 21 U.S.C. § 841(b)(1)(C), ("Count 4"); distribution of MDMA, in violation of 21 U.S.C. § 841(a)(1), ("Count 5"); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), ("Count 6"); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e), ("Count 7"). For the reasons set forth below, we affirm Akel's convictions and sentences.

## I. Background

### A. Motion to Suppress

Akel filed a motion to suppress evidence obtained as a result of a search and seizure conducted at his residence on November 3, 2007. He asserted that the search warrant affidavit incorrectly described the vehicle used during a controlled buy on May 31, 2007 and contained stale evidence obtained during two controlled

2

buys that occurred well over 30 days prior to the execution of the search warrant. In a memorandum in support of his motion, Akel argued that the two controlled buys could not support the search of his residence, because the buys were not conducted at his residence. He asserted that the search warrant was obtained by false pretenses, because the officer in charge swore that Akel drove a maroon Dodge Charger to the first controlled buy, even though video of the transaction showed a different type of vehicle.

The search warrant affidavit set forth the following facts: A CI informed detectives that he could purchase several MDMA pills from Akel. On May 31, 2007, agents searched the CI for money and contraband and then equipped him with an electronic recording device and supplied him with investigative funds. The CI then called Akel and made arrangements to meet Akel to purchase MDMA. Shortly thereafter, agents observed Akel leaving his residence. Officers watched Akel as he drove directly to meet the CI. The CI provided Akel with the investigative funds in exchange for MDMA. The CI then drove to meet officers and turned over the MDMA. A search of the CI and the CI's vehicle revealed no money or narcotics. During a second controlled buy, on July 18, 2007, the CI was again searched, equipped with an electronic recording device, and provided with investigative funds. The CI called Akel and made arrangements to purchase

3

MDMA and cocaine.  Akel was observed leaving his residence and driving directly to meet with the CI.  The CI provided Akel with investigative funds in exchange for MDMA and cocaine.  The CI turned over the MDMA and cocaine and a search of the CI and the CI's vehicle revealed no contraband or money.

The affidavit also described a trash pull conducted no more than 10 days prior to the filing of the affidavit.  The trash pull revealed the following items:

> flight itinerary for Delta Airlines (in Akel's name); owe sheets showing amounts of over $28,000.00; several empty large Zip-Loc food storage bags with one bag having the words "sour diesel" written on the side (through research "sour diesel" is a potent strain of cannabis that has very high levels of THC); numerous heat sealed storage bags, emanating a very strong odor of marijuana, containing marijuana residue; several dryer sheets which are commonly used to mask the odor of marijuana; loose tobacco which was purposely removed from a "blunt" cigar . . . loose marijuana which field tested with presumptive positive results for THC; several marijuana "blunt roaches" and miscellaneous documents containing the address of 9518 Pouder Lane, Akel's name and Akel's live in girlfriend Danielle Rudinsky's name.

Based on the affidavit, the state court issued a search warrant on November 2, 2007, authorizing officers to search Akel's home.

B.    Suppression Hearing

At the suppression hearing, Royce Eric Hanson, an Okaloosa County Sheriff's Office Investigator, testified that on May 31, 2007, he conducted

surveillance on Akel's residence. Hanson saw Akel leave his residence and return approximately 12 minutes later. A DVD of the surveillance footage depicted Akel getting into a maroon Chevrolet Malibu parked in the residence's driveway, driving away from the residence, and then returning to the residence in the same vehicle. Hanson said it was his understanding that after Akel left the residence, other officers observed him drive to a Dippin' Dots store, approximately 1.3 miles from Akel's residence, where the CI had arranged to meet him.

Hanson testified that he also conducted surveillance on Akel's home on July 18, 2007. A DVD of the surveillance showed Akel's garage door opening and Akel leaving the residence in a red Dodge Charger. The Charger soon returned to the house and Hanson again recognized Akel driving the vehicle. The vehicle pulled into Akel's residence and other officers notified Hanson that Akel had just left the Dippin' Dots location after meeting with the CI.

Al McDonough, an investigator with the Okaloosa County Sheriff's Office, testified that he conducted surveillance at the Dippin' Dots store where officers had arranged to conduct a controlled purchase of MDMA. Around 1:00 pm on May 31, Hanson notified him that Akel had left his residence and, "shortly thereafter," McDonough observed Akel arriving at the Dippin' Dots parking lot. McDonough testified that, prior to May 31, Akel had agreed to sell the CI a hundred MDMA

tablets. Officers searched the CI and the CI's vehicle before the controlled buy and, from the time the CI was searched until the time he met with Akel, the CI was under constant observation by law enforcement. A DVD of surveillance showed Akel's vehicle arriving at the Dippin' Dots, the CI leaving his vehicle and entering Akel's vehicle, and the CI sitting in the front passenger seat of Akel's vehicle. Akel gave the CI approximately 100 MDMA pills in exchange for the CI's buy money. Akel was driving a maroon Chevy Malibu. According to communications with Hanson, Akel had traveled directly from his residence to the Dippin' Dots. After Akel left, other officers observed Akel travel directly back to his residence. Immediately after the transaction, McDonough met with the CI, and took custody of the 98 MDMA pills he had just purchased.

McDonough testified that, on July 18, 2007, he conducted surveillance at the same Dippin' Dots. After Hanson observed Akel leave his home, McDonough observed Akel drive into the Dippin' Dots parking lot. The CI got out of his vehicle and entered Akel's vehicle, where the drug transaction occurred. Officers had searched the CI and his vehicle prior to the transaction. Akel drove a red Dodge Charger during this transaction. Afterward the CI provided officers with the 150 MDMA pills and the gram of cocaine he had purchased. After leaving the Dippin' Dots, Akel traveled directly home. From the transaction until the officers

6

met with the CI, the CI was under constant surveillance.

McDonough also participated in a trash rip at Akel's residence on November 1, 2007. He testified that officers found airline tickets and receipts in Akel's name, as well as mail addressed to Akel and a flight itinerary in Akel's name. They also found a document that appeared to "start[] out as a legitimate shopping list," but contained numbers that did not appear to "correspond with any kind of . . . purchases you would . . . make in a supermarket." Based on his training and experience, he believed this document to represent "monies that may be owed for drugs." Officers also found food storage bags, one of which had the words "sour diesel" written on it. According to McDonough, "sour diesel" was the "name of a certain strain of high grade, high potent marijuana." The bags contained a very strong smell of marijuana, as well as small amounts of marijuana residue.

On cross-examination, McDonough acknowledged that an affidavit in support of an arrest warrant incorrectly indicated that Akel was observed leaving his residence in a maroon 2006 Dodge Charger on May 31. Officers continued surveilling Akel's home periodically from July 18 until November 1 and, to his knowledge, did not observe any criminal activity during this time. McDonough acknowledged that all of the found documents bearing Akel's name were addressed to Akel's parents' residence.

7

On redirect, McDonough stated that the CI told him about marijuana transactions connected with Akel. Akel's taped conversations with the CI indicated that Akel was involved in the routine sale of marijuana, MDMA, and cocaine.

Matthew John Spratt, a detective with the Santa Rosa County Sheriff's Office, testified that he prepared the search warrant affidavit. That affidavit did not describe the vehicles involved with the two controlled buys. Spratt applied for a warrant to arrest Akel on the same day that he submitted the search affidavit. The arrest affidavit did contain a faulty vehicle description, because he mistakenly "put the wrong vehicle with the wrong buy."

The court found that there was "no manipulation or falsity . . . on behalf of law enforcement" and noted that the mistaken vehicle description was found in the arrest warrant affidavit, not the search warrant affidavit. The evidence contained in the affidavit was not stale, because "the trash pull brings everything up to date" and "the prior two buys suggest that you can make a purchase of any kind, which is further confirmation with the trash pull." The court concluded that "the good faith exception would apply in any case" and denied Akel's motion to suppress.

C.     <u>Trial</u>

Aaron Gatchell testified that he began working as an informant for law enforcement in early May 2007, after he was caught possessing MDMA and marijuana. He told officers about his past illegal drug activity and that Akel was his source of supply for MDMA and marijuana. He arranged to meet with Akel on May 31, 2007, to conduct a controlled purchase of MDMA.

Gatchell testified that, on May 31, 2007, he drove to a Dippin' Dots store to meet Akel and purchase 100 MDMA pills. Before meeting with Akel on May 31, law enforcement officers searched his car and person and equipped him and his vehicle with a body wire and a wire transmitter. The government played a videotape of the May 31 controlled buy and Gatchell identified Akel arriving in the Dippin' Dots parking lot in a maroon Malibu. He entered Akel's vehicle and Akel sold him MDMA. Akel gave him 100 MDMA pills and, after Akel drove away, Gatchell called law enforcement officers to meet him. He met with officers and turned over the MDMA pills immediately after the buy.

Akel agreed, in a subsequent recorded conversation, to sell Gatchell 150 MDMA pills and cocaine in exchange for $1500. Gatchell explained that Akel had previously attempted to sell him cocaine, but he did not want to "mess around with coke." Gatchell met with Akel on July 18, 2007, at Dippin' Dots, to purchase the MDMA and cocaine. Prior to the meeting, law enforcement searched Gatchell's

vehicle. The government played the surveillance video of the July 18 transaction and Gatchell noted that Akel drove a maroon Dodge Charger. Gatchell entered Akel's vehicle, gave Akel $1,500, Akel counted the money, and Akel gave him 150 ecstacy pills and cocaine in exchange for the money. Immediately after Gatchell left the Dippin' Dots, he met with law enforcement and provided them with the 150 ecstacy pills and the gram of cocaine that Akel gave him in exchange for the $1,500.

Gatchell had seen Akel in the possession of a firearm: He explained that he once met Akel at his house and Akel pulled out a gun and put it on his lap. When he first started dealing with Akel, Akel "would always keep the gun out on the table."

McDonough testified that he conducted surveillance on the Dippin' Dots store on May 31, 2007, and that officers searched Gatchell's person and his vehicle for contraband prior to the controlled buy. Once Gatchell was equipped with recording devices, officers followed him to the meeting location and parked in a secluded location from which they could observe the parking lot. McDonough saw Akel, driving a maroon Chevrolet Malibu, arrive at the Dippin' Dots shortly after Hanson observed Akel leaving his residence. Akel parked his car next to Gatchell's vehicle, Gatchell got out of his car and entered the passenger side of

10

Akel's car, and a couple of minutes later, Gatchell got out of Akel's car, and both Gatchell and Akel drove away. Officers surveilled Gatchell as he left and eventually met with him about a mile down the road, searched him and his vehicle, and retrieved the MDMA from him.

McDonough testified that, on July 18, 2007, officers met with Gatchell, searched him and his vehicle, and watched as Akel parked next to Gatchell in the Dippin' Dots parking lot, and Gatchell left his vehicle and entered Akel's car. Gatchell then left Akel's vehicle, returned to his own, and both Gatchell and Akel drove away. Gatchell left the parking lot and was under constant surveillance until he met with officers and provided them with the 150 MDMA pills and the gram of cocaine.

McDonough participated in a November 1, 2007 trash pull at Akel's residence. He found evidence of marijuana distribution in the trash bags, including large Ziploc bags, numerous heat-sealed bags, marijuana cigarettes, and marijuana residue.

McDonough arrived at Akel's residence shortly after the search warrant was executed on November 3, 2007. Officers seized an assault rifle and semiautomatic pistol during the search. McDonough saw marijuana individually packaged, a marijuana grove in the woods directly behind the residence, packaging materials,

11

two firearms, and a picture on a dresser of Akel holding an assault rifle.

Spratt testified that, on November 2, 2007, he applied for a warrant to search Akel's residence. When he and other officers entered Akel's residence on November 3, he observed Akel sitting on the couch. There was a firearm lying at Akel's feet and officers subsequently discovered a .9 millimeter pistol sticking out of a cushion on the couch. Both weapons were readily accessible and loaded.

Behind the residence, officers discovered an outdoor grove of marijuana plants just inside the treeline. A hose ran from the marijuana plants back to the house and was hooked up to a small swimming pool-type pump. In the kitchen, Spratt found a Tupperware-type container containing individually-packaged baggies of marijuana. In the garage, Spratt found marijuana stalks located in a wheelbarrow. Officers also photographed the screen of a laptop computer, which displayed a FedEx inquiry listing the tracking number of a package that was due to be delivered at 1:30pm on November 3, 2007. A FedEx package matching the tracking number of the computer inquiry was delivered to Akel's residence while officers were searching the home. The package was intercepted by law enforcement and found to contain a kilogram of cocaine. The contents of the package were wrapped in a heat-sealed-type wrapping, which was similar to bags found in Akel's home. Underneath this packaging, there was a layer of mustard

coating that bag containing the cocaine.

On cross-examination, Spratt acknowledged that he visited Rudinsky two times at the Santa Rosa County jail, and he believed that he told Rudinsky on one occasion that she could face weapons charges if she did not cooperate and testify against Akel. Once he played for Rudinsky a recording of Akel talking to a woman named Charity Cox. He said that the telephone conversation indicated that Cox was pregnant with Akel's child. On redirect, Spratt explained that he never questioned Rudinsky, but instead instructed her to listen to what the officers had to tell her and not say anything.

James Earl Thompson testified that, in 2006, Akel asked him to buy three firearms, an AR-15, a pistol, and Glock 40, in Thompson's name. Akel provided him with the money to buy the weapons, told him where to buy them, and told him the firearms to buy. Thompson stated that, after he purchased the firearms, Akel came to his home and got them.

John Leo Rudinsky, Jr., Danielle Rudinsky's father, testified that he was the title owner of the home in which Rudinsky and Akel resided. He owned weapons, but never kept any of the weapons in his daughter's residence. To his knowledge, his daughter had never owned a firearm. The AR-15 and Ruger pistol found at his daughter's residence did not belong to him.

13

Danielle Rudinsky testified that she pled guilty to trafficking cocaine, MDMA and marijuana. She began a relationship with Akel and moved into a duplex with him in June of 2006. She stated that Akel received drugs that were shipped to the duplex via FedEx. The MDMA was sent in heat-sealed packages. Akel also had cocaine and marijuana at the duplex. The high-grade marijuana that Akel possessed between June and December 2006 came from a man in Colorado. Some of this marijuana was delivered to Akel at the duplex, where Akel packaged the marijuana and resold it. The Colorado source of marijuana also supplied Akel with acid, which Akel put on SweetTarts and sold. In February 2007, Akel began purchasing marijuana from an individual named Jeff Hebner, who Rudinsky identified as one of Akel's "partners." Akel also began purchasing cocaine from a man named "Stick." Akel repackaged the marijuana in the house, but Rudinsky did not help with the repackaging.

Rudinsky agreed to travel to Riverside, California with Akel, where they stayed for about 25 days. While in California, Akel met a man named "Kevin," who sold him medical grade marijuana. Rudinsky and Akel shipped the marijuana in a heat-sealed bag and a box back to Florida. Akel returned to California alone multiple times to buy marijuana.

Rudinsky said she knew of "[a]bout five" people who distributed marijuana

14

for Akel. Rudinsky also said that, on one occasion, between September and early November 2007, Akel "was supposed to go to California and get one hundred pounds of commercial marijuana. He only got 30. And he paid a lady named Kathy to drive it back to Florida." She stated that Kathy drove the marijuana to Florida and delivered it to their home. Akel put the marijuana in separate bags and distributed it to his partners.

From September through early November 2007, Akel began purchasing MDMA from a woman named Charity ("Cox"), who lived in Atlanta. Cox was Akel's ex-girlfriend. She heard Akel and Cox talk about the transactions and Rudinsky herself deposited $5,500 in Cox's bank account at Akel's instruction. She and Akel once drove to Atlanta to pick up the pills and another time they met Cox halfway between Atlanta and their home in Florida. Akel repackaged and resold the MDMA pills he received from Cox.

Rudinsky and Akel planted marijuana plants in their backyard in a kiddy swimming pool. She explained that there were "nutrients that [the plants] got fed every other day or every third day. There was a big trash can and a pump and a water hose to feed them."

Rudinsky and Akel had just returned from California on the day that authorities raided the residence. The purpose of the California trip was to "go and

15

get drugs." When they arrived in San Diego, she and Akel bought a heat sealer, bags, and mustard. Akel bought a kilogram of cocaine from an unnamed individual and Akel repackaged the cocaine by placing it in two heat-sealed bags, coating the bags with mustard, and placing the cocaine in a brown bag. Rudinsky stated that she and Akel then traveled to Corona, California, where they stayed at a Holiday Inn Express, and mailed the cocaine, via FedEx, to Florida. Rudinsky followed Akel's instructions to fill out the shipping label and address the package to "Ms. Ludinski" at Pouder Lane. Rudinsky admitted that a video surveillance tape showed her mailing the FedEx package from a FedEx location in Corona, California. Rudinsky and Akel then flew back to Florida.

Rudinsky testified that Akel kept a silver pistol in between the cushions of the sofa at their house. He also kept an AR-15 assault rifle in various locations in the house. When people came to their house to buy or sell drugs, Akel would leave the weapons out in the open.

Rudinsky stated that after she was arrested, Akel told her "everything would be okay, just don't say anything, keep my mouth shut and we would both be out of trouble." She eventually agreed to cooperate with the government and tell the truth. She stated that she was not responsible for obtaining any particular result in Akel's case, but was instructed simply to tell the truth.

16

On cross-examination, Rudinsky acknowledged that two charges against her were dropped after she agreed to plead guilty to the conspiracy charge and testify against Akel. After she had hired a lawyer, Spratt and Carrier came to the jail to talk to her, even though her attorney had told her not to speak to anyone without him being present. Spratt and Carrier told her that she would be indicted on federal charges and could face 40 years to life in prison if she did not testify against Akel. They also threatened to charge her with the firearms that were found at the house. The officers played recorded phone calls between Akel and Cox, in which Cox told Akel that she was pregnant with his child. She stated the officers told her that she "need[ed] to think about [her] decision, think about what [she's] doing because, obviously, [Akel] doesn't care." When asked if investigators told her "that Tony Akel had been having sex with [her] mom," Rudinsky replied "[n]ot in so many words." When she was first arrested, Rudinsky told both investigators and her mother that Akel was doing nothing wrong. She once told her mother that authorities were trying to make her lie about Akel.

On redirect, Rudinsky testified that no one with law enforcement ever told her to lie about Akel or anything else. She stated that no one with the U.S. Attorney's Office or with law enforcement told her what to say at trial. She stated that when the agents played the tape of the conversation between Akel and Cox,

17

they instructed her not to say anything and did not ask her any questions. She stated that no one had threatened or coerced her.

Claude Cosey, a special agent with the Drug Enforcement Agency, testified that, during the grand jury proceeding, he "incorrectly stated to the grand jury that MDMA was recovered inside the residence and that the marijuana plants were found under grow lights inside the house, referring to inside the house, and that was incorrect." Cosey clarified that the marijuana plants "were actually out in the edge of the woods." He explained that he "thought at the time that the marijuana plants had been growing under the grow light inside as opposed to attached to the house by a hose." Cosey noted that the superseding indictment clarified that the marijuana was growing outside the residence. He said that the remainder of his grand jury testimony was accurate. On cross examination, counsel asked if Cosey recognized a photograph. Cosey said that he recognized the photograph because he had seen it before, but did not know who took it. Defense counsel asked "[d]oes [the photograph fairly and accurately represent what it purports to be, that is, a photograph of some things I'll ask you about in a minute?" Cosey responded "[y]es, it does." Defense counsel moved to admit the photograph into evidence and the government objected. The court noted that before the photo could be admitted, defense counsel had to establish who took the photograph,

18

when, how the witness knows who took the photograph and "things of that nature." The court refused to admit the photograph, based on a lack of predicate.

Both parties rested and, after having presented a very brief defense case, Akel moved for a judgment of acquittal and directed verdict of not guilty, which the court denied.

On the first day of deliberations, the jurors sent a note to the court stating "Your Honor, we're unable to reach a unanimous decision as to the guilty or not guilty verdict." The government requested an Allen[1] charge, to which Akel did not object. The court stated that it would give the jury the standard Allen charge. When the jury returned, the court stated:

> I'm going to direct that you continue your deliberations in an effort to reach agreement upon a verdict and dispose of this case. And I have a few additional comments that I want to offer for your consideration as you do so.
>
> This is an important case, and the trial has been expensive and time and effort and money and emotional strain to both the defense and the prosecution. If you should fail to agree on a verdict, then this case will be left open and may have to be tried again.
>
> Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried in front of you.

---

[1] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Any future jury would have to be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to other 12 men or women more conscientious or more competent to decide it or that more clearer evidence could be produced.

If a substantial majority of your number are in favor of a conviction, then those of you who disagree should reconsider whether your doubt is a reasonable one, since it appears to make no effective impression on the minds of the others. On the other hand, if a majority or even a lesser number of you are in favor of an acquittal, then the rest of you should ask yourselves, again, and more thoughtfully whether you should accept the weight and sufficiency of the evidence, which fails to convince your fellow jurors beyond a reasonable doubt.

Now, remember that at all times no juror is ever expected to give up an honest belief that he or she may have as to the weight and/or the effect of the evidence. But after full deliberation and consideration of the evidence in this case, it is your duty to agree upon a verdict if you can do so.

You must also remember that if the evidence in the case fails to establish guilty beyond a reasonable doubt, then the defendant should have your unanimous verdict of not guilty.

You may be as leisurely as you require in your deliberations and take as much time as you might feel is necessary, but I do now ask that you again retire to the jury room and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with the instructions that I have previously given to you.

Later that afternoon, the jury sent a second note, stating "[i]t was my hope, as foreperson of the jury, we would be able to reach a unanimous decision. I realize this communication – I assume – comes soon, but neither party will change their vote." The government reacted that "[i]t appears it's a hung jury, and we just ask for the trial to be rescheduled at the appropriate time." Akel concurred with the government, but the court stated that it did not feel "like they have been at it long enough" or that "either side has reconsidered their position." The court instructed the jury by written message to "please continue [its] deliberations." Later, the court sent the following message to the jury: "Do you feel you would have a verdict in the next few hours, or would you prefer to return tomorrow morning at 8:30 to continue your deliberations?" The jury responded through the foreperson's message: "It is my belief that a verdict may be reached, hopefully, in the next few hours." The jury subsequently found Akel guilty of Counts 1, 2, and 7, and not guilty of Counts 4-6.

D.    Presentence Investigation Report ("PSI")

Akel's base offense level, pursuant to § 2D1.1 was 32. His base offense level was increased two levels under § 2D1.1(b)(1), because he possessed a dangerous weapon.

Akel's offense level was increased four levels under § 3B1.1(a), because he

held a leadership role in a conspiracy involving five or more participants – namely, Akel, Rudinsky, Gatchell, Cox, Hebner, Rodriguez, and "other referenced sources of supply for Akel." Akel received an additional two-level increase for obstruction of justice under § 3C1.1, resulting in a total offense level of 40.

Akel was an armed career criminal under § 4B1.4(a), because he was previously convicted of three counts of burglary of a dwelling with assault and battery. The three offenses were committed on separate dates. However, Akel's offense level remained 40, because the offense level calculated under Chapters 2 and 3 of the Sentencing Guidelines was greater than the enhanced career offender offense level. Akel's offense level of 40 combined with his criminal history category of VI to yield a guideline imprisonment range of 360 months to life imprisonment on Count 7. Because the statutory maximum term of imprisonment for Counts 1 and 2 was 40 years, the guideline range on these Counts was 360 to 480 months.

The "Mental and Emotional Health" section of the PSI indicated that Akel "was diagnosed with anxiety/depression issues as well as possible bipolar disorder at the age of 17." Dr. James Larson evaluated Akel on two occasions in April 1998 and stated in a report

> I do believe that his judgment was seriously impaired
> during the time frame of the incident, both by underlying

22

> Bipolar Disorder and lengthy period and alcohol consumption. I doubt that he would have engaged in the alleged criminal conduct had he been appropriately diagnosed and treated for a mental disorder prior to the alleged offense.

Akel objected to the four-level leader/organizer adjustment as factually unsupported. Akel objected to the two-level firearm enhancement, because he was acquitted of possession of a firearm in furtherance of a drug trafficking offense. Next, Akel objected to his criminal history category being enhanced from IV to VI, pursuant to § 4B1.4(c), and argued that, because he was found not guilty of possessing a firearm in furtherance of a drug trafficking offense, he did not qualify for the § 4B1.4 enhancement. Akel also asserted that the application of both § 4B1.4 and § 2D1.1 was double counting. Finally, Akel argued that the court should consider evidence of his psychological problems in determining whether a downward adjustment or variance was warranted. Prior to sentencing, the government filed a motion asking the court to sentence Akel to the high end of the guideline range.

E.    Sentencing

Akel argued that the § 4B1.4 enhancement should not apply because he was acquitted of Count 6. He also asserted that "there may be a double counting problem," because he received enhancements under both §§ 4B1.4 and 2D1.1.

23

Akel argued that his previous burglary charges should be considered one offense, even though they were committed on three separate occasions, because all three offenses were included in the same indictment. With regard to the role enhancement, Akel argued that a two-point enhancement would be more appropriate than a four-point enhancement, because he was not a leader, organizer, or manager of the individuals identified by the government.

The court found that there was "no question" that the two-level § 2D1.1(b)(1) firearm enhancement was appropriate. It noted that

> [a]ll of the evidence is clear. He's sitting on a gun, he had a gun right on the table in front of him. And there is no question about that.
>
> And, quite frankly, I was somewhat surprised at the return of the jury's verdict with regard to the use of a firearm. Could not have been more clear to me. I don't know what to think of it, other than a jury compromise, because they did struggle to come to a – a verdict. But if – if we are basing it upon the evidence, the evidence is crystal clear that the man is sitting there doing a drug deal, or guarding from drug deals, he's got a gun tucked right beside him and sitting on it, that it's pretty much useful for that purpose in defense of his drug operations.

Based on these findings, the court overruled Akel's objections to both the § 2D1.1(b)(1) enhancement and the § 4B1.4 enhancement. The court also overruled Akel's objection to the role enhancement, finding, based on the evidence presented at trial, that it was "very clear, that [Akel] was the leader, organizer,

24

responsible for five or more participants acting at his direction." With regard to Akel's psychological problems, the court noted that none of Akel's associates who testified at trial mentioned that Akel suffered from psychological problems.

The court adopted the guideline calculations and factual findings contained in the PSI and imposed a sentence of 480 months' imprisonments on Counts 1, 2, and 7, to run concurrently, followed by 5 years' supervised release on each count, to run concurrently. The court noted that this sentence was at the top of the guideline range for Counts 1 and 2, "based upon what [the court found] to be aggravating factors, history and characteristics exhibited by the defendant." The court stated that it had reviewed the § 3553(a) factors and considered the sentence to be reasonable and necessary in light of those factors. After imposing sentence, the court explained:

> . . . it's not that I ignore or simply have not considered anything that [Akel] presented, because I certainly have, it's just the court's opinion that the other factors of . . . 3553(a) outweigh those considerations, particularly the – the dangerousness and the need to protect society from further criminal conduct.

## II. Law & Analysis

25

*Motion to Suppress*

A.   <u>False Statements</u>

The Fourth Amendment is violated if a warrant is obtained by using a false statement made intentionally or recklessly.  Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).  Where an informant is mentioned in the affidavit, the affidavit also must demonstrate the informant's "veracity" and "basis of knowledge."  United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).  "[W]hen there is sufficient independent corroboration of an informant's information, [however,] there is no need to establish the veracity of the informant."  Id. (internal quotations and citations omitted).  Hearsay may be the basis for a search warrant.  Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 828, 11 L.Ed.2d 887 (1964).

Akel has failed to show that any statement contained in the search warrant affidavit is false.  Even if he had made such a showing, he failed to establish that the false statements were made intentionally or recklessly.  See Martin, 297 F.3d at 1314.  Furthermore, the search warrant is not invalidated because it contained hearsay, because probable cause may be based on hearsay.  See Rugendorf, 376 U.S. at 533, 84 S.Ct. at 828.  Finally, the officers' surveillance of the two controlled buys sufficiently corroborated the information received from the CI.

26

B.    Staleness

Under the staleness doctrine, "information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000). However, there is no fixed time limit – staleness must be judged on the particular facts of each case. Id. at 1265. "In addition to the length of time, courts should consider the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Id. (internal quotations omitted). Stale information "is not fatal where the government's affidavit updates, substantiates, or corroborates the stale material." United States v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994) (internal quotations omitted).

The fact that the two controlled buys were conducted a month-and-a-half apart indicates that Akel's drug trafficking conduct was ongoing. Moreover, even if the evidence obtained from the controlled buys was somewhat stale, the evidence obtained through the trash pull refreshed it and arguably established probable cause on its own. See id. Accordingly, the search warrant affidavit was not stale.

C.    Probable Cause

We review the district court's determination that an affidavit contains probable cause de novo and the district court's findings of fact for clear error. United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000). To establish probable cause, the search warrant affidavit must state facts "sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." Martin, 297 F.3d at 1314. Information in the affidavit should "establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

The search warrant affidavit was sufficient to establish that evidence or contraband would be found at the residence. See Martin, 297 F.3d at 1314. The fact that Akel traveled directly from the residence to the controlled buys and immediately returned to the residence afterward indicates that the narcotics he sold to the CI were being stored in the home. The fact that large plastic bags containing marijuana residue, one bag labeled "sour diesel," were found during the trash pull supports the conclusion that narcotics were presently being stored in the home and would be found during a search. The affidavit was also sufficient to establish a link between Akel and the residence. See id. The affidavit indicated that documents in Akel's name were found in the trash pull. That fact, coupled with the fact that authorities observed Akel leave and return to the residence on two

occasions, establishes a link between Akel and the residence. Accordingly, the search warrant was valid and we need not address whether the good faith exception applies. See Jiminez, 224 F.3d at 1249 n.1 (declining to address applicability of the good faith exception where probable cause supported the search warrant).

*Validity of the Indictment*

"[T]he possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct." United States v. DiBernardo, 775 F.2d 1470, 1475 (11th Cir. 1985). To make out a claim of prosecutorial misconduct regarding the use of false testimony, a defendant must establish that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." United States v. Woodruff, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002). Perjury is defined as testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." United States v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008); see also, United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002). "Conviction beyond a reasonable doubt without the use of the tainted testimony or alleged misconduct at trial makes it highly

29

improbable that the grand jury indictment was based on insufficient probable cause." United States v. Gerate-Vergara, 942 F.2d 1543, 1550 (11th Cir. 1991).

As an initial matter, the fact that hearsay testimony was presented at the grand jury proceeding does not invalidate the indictment. See United States v. Williams, 504 U.S. 36, 50, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352 (1992) (noting that the presentation of hearsay evidence is permissible in grand jury proceedings). With regard to Cosey's grand jury testimony, there is no evidence that Cosey committed perjury, because Cosey testified at trial that his false statements to the grand jury were inadvertent and Akel has presented no evidence to the contrary. The government corrected the false statement at trial by questioning Cosey about the misstatements. Additionally, Cosey's statement that the marijuana plants were found inside the residence was immaterial to the return of the indictment because, regardless of whether the plants were found inside or outside of the home, they still were found near the premises and supplied with hose water from the house. Moreover, because the jury, after hearing Cosey's corrections, convicted Akel of Counts 1, 2, and 7, it is "highly improbable that the grand jury indictment was based on insufficient probable cause." See Gerate-Vergara, 942 F.2d at 1550. Accordingly, the district court did not plainly err in failing to dismiss the indictment.

*Voluntariness and Credibility of Rudinsky's Testimony*

The district court's refusal to grant a new trial based on the government's knowingly presenting perjured testimony at trial is reviewed for an abuse of discretion. United States v. Jordan, 316 F.3d 1215, 1248-49 (11th Cir. 2003). However, an issue raised for the first time on appeal is reviewed for plain error, and requires a showing of (1) error; (2) that is plain and obvious; and (3) that affects substantial rights. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). We will correct such an error only if the error seriously affects the "fairness, integrity, or public reputation of judicial proceedings." Id.

In Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), the Supreme Court ordered a new trial when the government knew or should have known that one of its witnesses committed perjury. Id. We have held that, to succeed on a Giglio claim, a defendant must show that the government "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001) (internal quotations omitted).

In Wilcox v. Ford, 813 F.2d 1140, 1148 (11th Cir. 1987), we held that a

31

defendant's due process rights were not violated by the introduction of allegedly coerced witness testimony, because the defendant was aware of the nature of the interrogation, had access to the tapes and transcripts of the interrogation prior to trial, and was able to cross-examine both witnesses. Id. at 1148-49; see also Brown v. Jones, 255 F.3d 1273, 1281-82 (11th Cir. 2001) (holding that the district court did not err in admitting evidence of an allegedly coerced interrogation where the taped interrogation was played for jurors and the defendant cross-examined the witness at length about the interrogation).

Here, there is no evidence that Rudinsky testified falsely. Rudinsky stated that authorities or representatives of the government instructed her to tell the truth at trial. She stated that she was, in fact, telling the truth and that no one had coerced her to testify a certain way. Akel has failed to show that Rudinsky testified falsely or that the government "knowingly used perjured testimony." Dickerson, 248 F.3d at 1041.

Furthermore, although investigators allegedly forced Rudinsky to listen to a taped conversation between Akel and Cox, they specifically instructed her not to speak. This conduct does not rise to the level of the investigators' conduct in Wilcox. In addition, Akel knew about the investigative methods prior to trial and cross-examined Rudinsky extensively about those matters. Thus, the jury was able

32

to draw its own conclusions as to the reliability of the testimony. Based on these facts, the district court did not plainly err by allowing Rudinsky to testify without first determining whether her testimony was coerced. See Wilcox, 813 F.2d at 1149; Brown, 225 F.3d at 1282.

*Refusal to Admit Photograph*

We review evidentiary rulings for abuse of discretion and will only reverse if an error has affected a defendant's substantial rights. United States v. Wright, 392 F.3d 1269, 1276 (11th Cir. 2004). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004). "The decision of whether or not a particular piece of evidence has been appropriately identified falls within the discretionary function of the district court, and that determination will not be disturbed on appeal absent a showing that there is no competent evidence in the record to support it." United States v. Caldwell, 776 F.2d 989, 1001 (11th Cir. 1985).

Rule 901 provides that the requirement of authentication or identification for admissibility of evidence "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). "A

witness qualifying a photograph need not be the photographer or see the picture taken; it is sufficient if he recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it." United States v. Clayton, 643 F.2d 1071, 1074 (5th Cir. 1981).

At trial, Cosey never indicated that he was familiar with the items depicted in the photograph, which were not identified either by Cosey or by defense counsel's questioning. Defense counsel also failed to make a proffer or some other showing about the substance of the evidence that he sought to admit. See Fed.R.Evid. 103(a)(2). Thus, the court reasonably determined that Akel failed to provide a sufficient foundation for admitting the photograph. See Clayton, 643 F.2d at 1074. Moreover, Akel could have pursued further questions or other efforts to lay a sufficient foundation or explore the subject matter, but he chose to desist. Based on this record, the district court did not abuse its discretion or cause substantial prejudice to Akel's defense in ruling that the photograph was inadmissible.

*Allen Charge*

"[Our] inquiry on appeal of a district court's decision to give an Allen charge is limited to evaluating the coercive impact of the charge. . . . The question we address is whether under the circumstances and language of the Allen charge

34

the jury was unduly coerced into reaching a verdict." United States v. Elkins, 885 F.2d 775, 783 (11th Cir. 1989). If a jury is not polled prior to giving the Allen charge, as here, we will reverse only if we find under the totality of the circumstances that the charge was inherently coercive. United States v. Prosperi, 201 F.3d 1335, 1341 (11th Cir. 2000).

A charge that "encouraged jurors to reach a unanimous verdict, but also instructed jurors not to give up honestly held beliefs and to return a not guilty verdict if the evidence did not show guilt beyond a reasonable doubt" is not inherently coercive. United States v. Kramer, 73 F.3d 1067, 1072 (11th Cir. 1996). We have approved of an Allen charge which included a request that jurors reconsider their positions, cautioned that no juror should give up an honest belief, and did not explain the mistrial option. United States v. Chigbo, 38 F.3d 543, 544-45 (11th Cir. 1994). A judge's request that a jury continue deliberating, without polling the jury or suggesting that an outcome is desired or required, is not inherently coercive. Prosperi, 201 F.3d at 1341.

With regard to the district court's initial Allen charge to the jury, the fact that the court "directed" the jurors to continue deliberating, rather than "asking" them to do so does not render the Allen charge coercive, because, regardless of that language, jurors are expected to continue deliberating after the charge is read.

35

Furthermore, the court specifically stated that the case would have to be tried again if jurors did not reach a unanimous verdict. It also explained that no juror was expected to give up an honest belief that the defendant was guilty or not guilty. Thus, the instructions as a whole made it clear that a hung jury was legally permissible.

The second instruction given by the court was not a full Allen charge, but, instead, a simple request to continue deliberating. Because the court's request did not indicate that an ultimate outcome was desired or required, it was not unduly coercive and does not constitute reversible error. See Prosperi, 201 F.3d at 1341.

Finally, Akel asserts that the court erred when it asked jurors whether they wished to continue deliberating or return in the morning. This message was not unduly coercive, because jurors were told that they would be given an opportunity to continue deliberating the next day. This question actually had an effect the opposite from imposing a time constraint, because the question necessarily implied that jurors could take as much time as they needed to reach a unanimous verdict, even if it was necessary to return the next day. Accordingly, the jury was not coerced into reaching a verdict and the district court committed no error.

*Sufficiency of the Evidence*

Whether the record contains sufficient evidence to support a jury's verdict is a question of law that we review de novo.  United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005).  We review "the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor."  Id.

To convict a defendant of conspiracy under 21 U.S.C. § 846, "the government must prove that there is an agreement by two or more persons to violate the narcotics laws."  United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990).  "The government must prove knowledge, intent and participation beyond a reasonable doubt."  Id.  "A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy."  Id.

The evidence is sufficient to support the jury's verdict that Akel was guilty of conspiring to distribute cocaine, MDMA, and marijuana.  Rudinsky testified that she helped Akel tend to marijuana plants growing in their backyard.  She and Akel traveled to California to purchase cocaine, which they then shipped to their residence in Florida, where Akel would repackage the cocaine and resell it. Rudinsky stated that Akel instructed her to fill out the shipping form and express

37

the package of cocaine from California. Furthermore, Rudinsky allowed Akel to receive, repackage, and distribute cocaine, MDMA, and marijuana from their home. Accordingly, the evidence supports Akel's conviction for conspiring with Rudinsky to distribute cocaine, MDMA, and marijuana.

*U.S.S.G. § 3B1.1 Role Enhancement*

"A district court's upward adjustment of a defendant's Guidelines offense level due to his status as a leader or organizer under U.S.S.G. § 3B1.1 is a finding of fact reviewed only for clear error." United States v. Phillips, 287 F.3d 1053, 1055 (11th Cir. 2002). Clear error is present if we are "left with a definite and firm conviction that a mistake has been committed." United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005). At sentencing "[t]he government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense." United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003).

The Sentencing Guidelines provide for an increase in offense level based on the defendant's aggravating role in the offense. U.S.S.G. § 3B1.1. A four-level increase is applied if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In distinguishing between a leader or organizer and a mere

manager or supervisor, the district court should consider several factors, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). A mere "buyer/seller relationship" is insufficient to justify even a three-level enhancement under § 3B1.1(a). United States v. Glinton, 154 F.3d 1245, 1260 (11th Cir. 1998) (also holding that "a role enhancement is inappropriate absent evidence the defendant actively recruited buyers or directed their activities").

The district court heard the evidence, considered the argument of counsel on this question and found that "its clear from the evidence, judging the credibility of the witnesses and such at the same time, that the role enhancement is also very clear, that he was the leader, organizer, responsible for five or more participants acting at his direction." Sentencing Tr. at 12-13, June 19, 2008. The sentencing judge reviewed the Presentence Investigation Report ("PSI"), found it accurate and accepted its findings of fact. In the PSI there are specific facts set forth as to James Thompson, Danielle Rudinsky, Cathy Rodriguez, Aaron Gotchell and Jeff Hebner and the activities they were involved in at the direction of the appellant. PSI at 14-

39

15. The trial transcript reveals additional testimony as to these individuals and others. Thus, there exists no clear error and the four-level enhancement is fully supported by the record.

*U.S.S.G. §§ 4B1.14 and 2D1.1 Enhancements*

    A.    U.S.S.G. § 2D1.1

We review a district court's interpretation of the Guidelines de novo, but accept the district court's factual findings unless they are clearly erroneous. United States v. Scott, 447 F.3d 1365, 1368 (11th Cir. 2006). Section 2D1.1(b)(1) provides that a defendant's base offense level should be increased by 2 levels "[i]f a dangerous weapon was possessed." U.S.S.G. § 2D1.1(b)(1). The enhancement is to be applied if a firearm was possessed "during the offense of conviction or during related relevant conduct." United States v. Smith, 127 F.3d 1388, 1390 (11th Cir. 1997). The weapon enhancement should be applied if a weapon was present, unless it was clearly improbable that the weapon was connected with the offense. U.S.S.G. § 2D1.1, comment. (n.3).

The fact that Akel was acquitted of Count 6 does not bar the application of § 2D1.1(b)(1), because the court's sentencing findings need meet only the "preponderance of the evidence" standard, rather than the more substantial "beyond a reasonable doubt" standard required for conviction. See United States

40

v. Faust, 456 F.3d 1342, 1347 (11th Cir. 2006). Furthermore, the facts support the application of § 2D1.1(b)(1). Gatchell testified that Akel, on numerous occasions, brandished both the Ruger and the Glock handguns during drug transactions, and Rudinsky stated that Akel routinely kept the weapons in plain view during drug transactions. When authorities first entered the residence, they observed Akel sitting on the couch with an assault rifle at his feet and another firearm stashed underneath the couch cushion. Inside, authorities also found drugs packaged for distribution and, based on their prior surveillance, determined that the residence was used as the "base of operations" for the drug conspiracy. Thus, the district court did not err in applying the § 2D1.1(b)(1) enhancement.

B.    U.S.S.G. § 4B1.4

We review de novo whether multiple crimes constitute a single criminal episode for purposes of § 924(e). United States v. Spears, 443 F.3d 1358, 1360 (11th Cir. 2006). We also review de novo interpretations of guideline provisions. United States v. Wilks, 464 F.3d 1240, 1242 (11th Cir. 2006).

Section 924(e) states,

> [i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony . . . committed on occasions different from one another, such person shall be . . . imprisoned not less than fifteen years . . . .

41

18 U.S.C. § 924(e)(1). Separate offenses must be committed on separate occasions, but the convictions need not be obtained on separate days. United States v. Jackson, 57 F.3d 1012, 1018 (11th Cir. 1995). Offenses will be considered separate if they were committed on separate days, even if the legal consequences were imposed on the same day and the sentences were to be served concurrently. See id.

The relevant inquiry under § 924(e)(1) is whether the prior offenses were committed on separate days, not whether the convictions were obtained or the sentences were imposed on separate days. See id. Here, Akel committed the burglary offenses on three separate days. Furthermore, the fact that Akel was acquitted on Count 6 is irrelevant, because all that § 924(e) requires is that (1) the defendant be convicted of a § 922(g) offense and (2) the defendant have three previous convictions for violent felonies. See 18 U.S.C. § 924(e). Akel met these requirements. Accordingly, the district court did not err in applying the enhancement.

C.    Double Counting

We review de novo a claim of double counting. United States v. Naves, 252 F.3d 1166, 1168 (11th Cir. 2001). "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on

42

account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999). Double counting is permissible where (1) the Sentencing Commission intended the result, and (2) each guideline section in question concerns a conceptually separate notion related to sentencing. See id. at 1310. We presume the Sentencing Commission intended to apply separate guideline sections cumulatively, unless specifically directed otherwise. Id.

The application of both §§ 2D1.1(b)(1) and 4B1.4 did not constitute impermissible double counting, because each provision addresses different kinds of harm. See id. at 1309. Section 2D1.1(b)(1) addresses the danger associated with possessing a firearm in furtherance of a drug offense, regardless of a defendant's criminal history, whereas § 4B1.4 addresses the recidivist harm associated with an armed career offender committing an additional firearm offense, regardless of whether the firearm was possessed in connection with a drug offense. Moreover, we assume that these sections are to be applied cumulatively, because the Guidelines do not state otherwise. See id. at 1310. Accordingly, the district court did not err in applying both enhancements.

*Diminished Capacity*

As an initial matter, we decline to review the denial of a downward

43

departure under § 5K2.13, because Akel does not allege and the record does not show that the district court mistakenly believed that it lacked the authority to grant a downward departure based on reduced mental capacity. See United States v. Hansen, 262 F.3d 1217, 1256 (11th Cir. 2001) (holding that we "may not review a district court's refusal to grant a downward departure unless the court mistakenly believed that it lacked the authority to grant such a departure").

We review the final sentence imposed by the district court for reasonableness. United States v. Booker, 543 U.S. 220, 264, 125 S.Ct. 738, 767, 160 L.Ed.2d 621 (2005). Specifically, the district court must impose a sentence that is both procedurally and substantively reasonable. Gall v. United States, 552 U.S. __, __, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). A sentence may be procedurally unreasonable if the district court failed to consider the appropriate statutory factors. Id. "[T]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008). A sentencing court need not state on the record that it has considered each § 3553(a) factor and need not discuss each factor; rather, an acknowledgment by the district judge that he or she had considered the § 3553(a) factors will suffice. Ellisor, 522 F.3d at 1278.

Akel's sentence was procedurally reasonable because the district court stated

at sentencing that it had considered the § 3553(a) sentencing factors and found, in light of these factors, that a 480-month sentence was both reasonable and necessary. Akel's sentence was also substantively reasonable. The court acknowledged Akel's argument regarding his diminished mental capacity, but found that other aggravating factors – namely, the need to protect the public from future crimes and the need to deter others from committing similar crimes – outweighed any mitigating factors. In light of the record, specifically, the extent and the ongoing nature of the drug trafficking conspiracy, Akel's prior violent offenses, and Akel's attempts to obstruct justice, his sentence does not appear to be unreasonable. Accordingly, we affirm Akel's convictions and sentences.

**AFFIRMED.**