[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10534

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 21, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00081-CR-ORL-19-GJK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS PALOMINO GARCIA,
a.k.a. Ramon Lopez-Garcia,
a.k.a. Jose Luis Palomino Garcia,
a.k.a. Luis Garcia Palomino,
a.k.a. Jose Luis Palomino,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 21, 2010)

Before DUBINA, Chief Judge, MARTIN and HILL, Circuit Judges.

MARTIN, Circuit Judge:

Luis Palomino Garcia appeals his conviction and 70-month sentence for illegal reentry into the United States in violation of 8 U.S.C. § 1326(a). He argues that his prosecution was barred altogether by the statute of limitations. Failing that, he argues that he was sentenced improperly in several ways. He says that his sentence was wrongly enhanced because his prior Arizona conviction for aggravated assault is not a "crime of violence" under the Sentencing Guidelines; that his sentence is unreasonable; and that the government's failure to allege in the indictment or prove to a jury a prior aggravated felony conviction violates his rights under the Fifth and Sixth Amendments. After thorough review and oral argument, we conclude that the district court did not abuse its discretion in failing to dismiss the indictment on statute of limitations grounds. We do, however, find the district court committed error by enhancing Mr. Palomino Garcia's sentence based on his conviction for aggravated assault under Arizona law. We therefore reverse and remand for resentencing on that issue.

## I.

Mr. Palomino Garcia was born in Mexico and entered the United States at some point during the 1970s. He was deported on two separate occasions, once in 1995 and again in 1996 following his conviction for assaulting a police officer.

2

After being deported for the second time in 1996, he again illegally reentered the Untied States.

In 1997 he met Danette Negron, whom we will refer to as Mrs. Palomino. She is a United States citizen, and she and Mr. Palomino Garcia were married in 1999. About two years later, and just prior to the expiration of a provision of federal law creating a pathway to permanent legal status for certain undocumented immigrants,[1] Mrs. Palomino filed an I-130 Petition for Alien Relative with the Immigration and Naturalization Service ("INS").[2] The I-130 Petition filed by Mrs. Palomino provided a substantial amount of accurate information about her husband. For example, the I-130 Petition accurately provided Mr. Palomino Garcia's current address in Mesa, Arizona; his date and place of birth in Mexico; his social security number; the date of his marriage, again in Mesa, Arizona; and the name and address of his employer in the United States. Other information, however, was contradictory or incomplete. For example, the I-130 Petition listed

---

[1] See Legal Immigration Family Equity Act, Pub. L. No. 106-553, §§ 1101–1104, 114 Stat. 2762, 2762A-142 to -149 (2000), amended by Pub. L. No. 106-554, §§ 1501–1506, 114 Stat. 2763, 2763A-324 to -328 (2000) (repealed 2001); see generally Balam-Chuc v. Mukasey, 547 F.3d 1044, 1046 (9th Cir. 2008) (explaining the history and purpose of the Act). We express no opinion on whether Mr. Palomino Garcia would have been eligible for adjustment of status under the amnesty provision.

[2] An I-130 Petition is a required first step for aliens seeking a "green card," and is a vehicle by which immigration officials establish a valid relationship between the alien and the citizen.

3

the defendant's name as "Luis Palom Palomino." At the same time, the Biographic Information form accompanying the petition stated his name as "Luis Palomino Garcia," and he signed the Biographic Information form with that name. However, attached to the Petition was a copy of a marriage certificate showing his name as "Luis Palmino" instead of "Luis Palomino." The I-130 Petition did not include Mr. Palomino Garcia's Alien Registration Number despite the fact that two numbers had been previously issued to him. An item requesting any "Other Names Used (including maiden name)" was left blank, although information later submitted by Mrs. Palomino indicates that her husband has used at least seven different aliases.[3] Also in response to an item requesting the date Mr. Palomino Garcia "last arrived as a (visitor, student, stowaway, without inspection, etc.)," Mrs. Palomino omitted any fact of his reentry after his previous two deportations, writing only: "Came here 25 yrs ago lives here." And although Mrs. Palomino checked a box accurately indicating that her husband had been previously deported from Arizona in 1995, she omitted any reference to his 1996 deportation.

On April 3, 2002, the INS service center in California sent an Additional Evidence Request ("AER") seeking additional information from Mrs. Palomino.

---

[3] These included: "Antonio Garcia," "Juan Garcia," "Jose Louis Garcia Palomino," "Jesus Garcia," "Luis Palomino," "Mario Valencia," and "Luis Garcia."

4

The AER asked for evidence that the "Luis Palmino" listed on the marriage certificate referred to the same "Luis Palomino" for whom the petition was filed. Specifically, it sought a registered or recorded copy of the marriage certificate with Mr. Palomino Garcia's name spelled correctly. It requested complete biographic information for both Mr. and Mrs. Palomino with photographs of the two of them. In addition, the AER noted that the initial application indicated that "Luis Palomino" had been subject to prior "immigration proceedings," and requested "an explanation of why [the defendant] is under immigration proceedings, including all information, circumstances, dates, file numbers, and photocopies of any correspondence relating to this matter."

Mrs. Palomino responded to the AER in June 2002, partially complying with the requests made. She provided a certified copy of the defendant's birth certificate from Mexico (though not an English language translation). She supplied a corrected marriage license reflecting the defendant's name as "Luis Palomino." She sent photographs of herself and her husband, as well as updated Biographic Information forms correctly identifying the defendant as "Luis Palomino Garcia." Again, however, she failed to include his Alien Registration Number (omitting it from two different forms) and listed the defendant's name incorrectly as "Luis Palomino Garica" in the field for "other names used."

5

Perhaps most notably, she did not provide any additional information regarding either of the defendant's two prior deportations except to add "Mesa" to the location of the 1995 proceeding.

Nearly two years would pass before Mrs. Palomino heard anything more regarding her I-130 Petition.[4] During this time the INS was divided into three separate agencies as a result of a restructuring following the September 11, 2001 terrorist attacks.[5] Then in March 2004, the newly created Citizenship and Immigration Services ("CIS") sent another AER to Mrs. Palomino requesting, again, that she provide more information about the defendant's prior immigration proceedings. A third AER followed in July 2004, this time requesting evidence of Mrs. Palomino's citizenship.

Mrs. Palomino responded to these AERs in June and October 2004, respectively. We share the district court's observation that the record is not

---

[4] The record indicates that in August 2002—two months after she responded to the AER—the INS either sent or attempted to send a second AER to Mrs. Palomino reiterating its request for information concerning Mr. Palomino Garcia's prior deportation proceedings. It appears that this AER either was mailed to an incorrect address or Mrs. Palomino simply did not respond. In any event, neither the AER nor a response from Mrs. Palomino is included in the defendant's immigration file and no testimony concerning this request was presented to the district court.

[5] On March 1, 2003, INS split into three agencies and was reorganized under the new Department of Homeland Security. Under the reorganization, INS became three new agencies: Citizenship and Immigration Services, Immigration and Customs Enforcement, and Customs and Border Protection.

entirely clear as to which documents were included in which response. We do know that these responses collectively included Mrs. Palomino's New York birth certificate; a corrected marriage license showing the defendant's name as "Luis Palomino;" and various court records pertaining to two of Mr. Palomino Garcia's prior state criminal convictions. Although Mrs. Palomino never gave all of the requested information about her husband's prior deportation proceedings, the court records she provided do at least mention Mr. Palomino Garcia's initial illegal entry into the United States in 1976; that he has been previously "deported on several occasions;" and that he returned illegally only four days after his deportation in 1995.

Following receipt of Mrs. Palomino's 2004 responses to the AERs, her I-130 Petition was stamped complete and ready for filing. Consistent with CIS procedure, the file was then reviewed and a database search run to check Mr. Palomino Garcia's "status," which is to say the legality of his presence, before the file was sent to a CIS field office for investigation. Based on this review, CIS determined that Mr. Palomino Garcia was residing in the United States illegally after having been previously deported. This determination was documented in a December 29, 2004 memorandum to Mr. Palomino Garcia's file. Despite CIS's knowledge of Mr. Palomino Garcia's illegal reentry, no action was taken to

7

prosecute him until, more than three years later, he was arrested in Florida for a traffic violation and local authorities alerted Immigration and Customs Enforcement agents to his presence.

On April 9, 2008, almost seven years after the original I-130 Petition was filed, the government obtained a one-count indictment charging Mr. Palomino Garcia with illegal reentry in violation of 8 U.S.C. § 1326(a). Mr. Palomino Garcia stipulated to each element of the offense, but moved to dismiss the indictment as time-barred. After a hearing, the district court found that immigration authorities acted with reasonable diligence in determining the defendant's illegal presence in the United States, and denied his motion to dismiss the indictment. The district court relied on the incomplete and inaccurate information contained in the I-130 Petition and responses to the AERs, as well as the large number of petitions received by the government around the same time and the increased security measures and demands on law enforcement officers resulting from the September 11th terrorist attacks. The district court then found Mr. Palomino Garcia guilty of illegal reentry and imposed a sentence of 70-months imprisonment, which was the bottom of the Guidelines range. This appeal followed.

## II.

Mr. Palomino Garcia argues that his April 9, 2008 indictment is barred by the statute of limitations and that the district court erred when it denied his motion to dismiss the indictment. This Court reviews a district court's denial of a motion to dismiss the indictment for abuse of discretion. United States v. Clarke, 312 F.3d 1343, 1345 n.1 (11th Cir. 2002) (citing United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998)). However, "we review de novo 'the district court's interpretation and application of the statute of limitations.'" United States v. Torres, 318 F.3d 1058, 1061 n.6 (11th Cir. 2003) (quotation omitted).

Under 8 U.S.C. § 1326(a), an alien is subject to imprisonment if he has been previously deported, and then "is at any time found in" the United States without having obtained the express consent of the Attorney General to reapply for admission. 8 U.S.C. § 1326(a).[6] Section 1326(a) does not provide a statute of limitations. The general five-year limitations period for noncapital offenses in 18 U.S.C. § 3282(a) therefore applies and an indictment charging a § 1326(a) offense must be handed down within five years of the date on which the offense is "complete." Toussie v. United States, 397 U.S. 112, 115, 90 S. Ct. 858, 861

---

[6] With the creation of the Department of Homeland Security, the reference to the Attorney General in 8 U.S.C. § 1326 is deemed to refer to the Secretary of Homeland Security. 6 U.S.C. § 557.

(1970); Clarke, 312 F.3d at 1346. Although the perpetration of a § 1326(a) offense can continue for years, the crime is not complete—and the statute of limitations does not begin to run—until the illegal immigrant is "found in" the United States. United States v. Scott, 447 F.3d 1365, 1369 (11th Cir. 2006); Clarke, 312 F.3d at 1346. This occurs when immigration authorities "either know of or, 'with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of the defendant's presence.'" Scott, 447 F.3d at 1369 (quoting Clarke, 312 F.3d at 1346).

Whether Mr. Palomino Garcia's indictment was timely turns on when he was "found." Mr. Palomino Garcia argues that he was found on April 30, 2001—the date his wife filed the original I-130 Petition. He says it is on that date that immigration authorities could have discovered his illegal reentry had they acted diligently and investigated his status using the information given to them. Alternatively, he argues that he was found no later than June 24, 2002, when the INS received Mrs. Palomino's response to the April 3, 2002 AER. Either way, he says that his April 9, 2008 indictment was outside the five-year statute of limitations because immigration authorities could have known that he illegally reentered the country based on the information his wife provided in those two submissions.

10

It is certainly true that the original I-130 Petition and Mrs. Palomino's response to the April 3, 2002 AER contained a significant amount of truthful information regarding the defendant's identity. It told where he was then living in the United States, and the fact of his prior deportation. This information, we believe, was likely sufficient for immigration authorities to investigate Mr. Palomino Garcia's status and discover that he had reentered the United States and was residing here illegally. But the question we must answer is not whether it would have been *possible* for immigration authorities to determine that Mr. Palomino Garcia was in the United States illegally based on the information his wife provided. Instead, the question is whether immigration authorities acting with reasonable diligence *should have known* of his illegal reentry based on that information. Our task is to determine whether immigration authorities acted with reasonable diligence in investigating Mr. Palomino Garcia's status.

What constitutes reasonable diligence will, of course, vary with the facts and circumstances of each case. And our review of the diligence of immigration officials necessarily requires inquiry into the agency's methods and procedures, as well as the tools immigration authorities had at their disposal in 2002. See Clarke, 312 F.3d at 1348 ("There is no indication that the INS had some sort of pre-trial immigration status screening procedure in place in Florida that should have

11

discovered Clarke's presence . . . ."); United States v. Mercedes, 287 F.3d 47, 55 (2d Cir. 2002) ("Given Mercedes's attempts to deceive, the procedural mechanisms in place and the tools available to the INS in 1993, we cannot say that the INS's efforts fell short of the diligence typical of [federal immigration] law enforcement authorities . . . ." (quotation and footnote omitted) (alteration in original)); United States v. Acevedo, 229 F.3d 350, 355 (2d Cir. 2000) ("Although Acevedo claims that immigration authorities, through the exercise of diligence, should have discovered his violation at the time of reentry, Acevedo does not suggest that immigration authorities had available any equipment enabling them to conduct the necessary investigation." (quotation and citation omitted)).  But as Mr. Palomino Garcia conceded at oral argument, there is simply no evidence in the record indicating whether, in 2002, immigration officials had the ability to quickly or easily determine the illegality of his presence using the myriad information his wife submitted in the I-130 Petition and response to the April 3, 2002 AER.[7]

---

[7] For example, there is no evidence in this case about the databases available to immigration officials at that time; the process for searching those databases; or the accuracy of the results returned. Nor is there evidence about how difficult or time consuming those searches might be; what information the agency needs to perform them; and whether the necessary information was provided in the I-130 Petition and response to the April 3, 2002 AER.  The record is also silent as to whether those searches frequently generate false leads that must then be followed, potentially diverting valuable agency resources.

In contrast to the silence of the record on these points, the record evidence is clear that it would have been contrary to agency procedures for processing I-130 Petitions for immigration authorities to perform a status search before Mr. Palomino Garcia's petition was complete. The record also reveals that, consistent with those procedures, the agency moved quickly to investigate Mr. Palomino Garcia's status once his application was complete. No agency may properly establish procedures that unreasonably delay investigations or render it wilfully blind to information provided to it. However, we are reluctant to mandate that the agency assigned the job of processing and evaluating vast numbers of applications each year deviate from its established procedures unless we have clear evidence that it was unreasonable for the agency to follow its procedures.

We also think it significant that this case arose in the context of an I-130 Petition and not in the course of a law enforcement investigation. An I-130 Petition is used only to establish a relationship between a citizen or permanent resident alien and an alien relative who wishes to immigrate to the United States. It is merely the first step in a lengthy immigration process involving visa applications, detailed background checks, and applications to adjust to permanent resident alien status. Viewed in this context, immigration officials could reasonably elect to implement procedures requiring a single status search upon the

13

completion of each application. Repeated investigatory diversions might impede the agency's ability to efficiently process the large number of applications it receives and increase the delay for people waiting to gain lawful entry into this country.[8] We cannot say, based on the record before us, that immigration officials acted unreasonably by implementing procedures requiring a single status search upon the completion of each application. This is particularly true here, where those procedures were promptly carried out once the I-130 file was complete.

And finally, we note that the passage of time between the filing of the I-130 Petition and its completion in 2004 was occasioned in large part by Mrs. Palomino's failure to provide complete and accurate information in the I-130 Petition and her responses to the AERs. Although the district court found that this amounted to deception, it is enough for our purposes that the delay in completing the I-130 Petition did not result from a lack of diligence on the agency's part. To the contrary, the record shows that Mrs. Palomino filed an I-130 Petition that, at a minimum, contained incomplete and inaccurate information. This necessitated repeated requests for additional evidence from immigration officials, including at

---

[8] We also recognize that holding immigration authorities had constructive notice of Mr. Palomino Garcia's illegal reentry based on Mrs. Palomino's pre-completion I-130 filings would all but mandate the agency adopt procedures requiring low-level employees charged with the initial processing of I-130 Petitions to scan continuously the stream of paper flowing across their desks, lest a later prosecution be barred by the statute of limitations. We decline to impose such a rule on the facts before us.

14

least two requests for information concerning the defendant's prior immigration proceedings. This is simply not a case like Scott where immigration officials failed to act despite the fact that the defendant "gave a full confession" to law enforcement agents at the outset, providing his true name, admitting that he had reentered the country illegally, and giving details of his prior deportation and illegal reentry using a fraudulent passport. See Scott, 447 F.3d at 1367.

Given the totality of the circumstances in this case, we cannot say that immigration authorities, armed with the information provided by Mrs. Palomino through 2002, failed to act with reasonable diligence in investigating Mr. Palomino Garcia's status. This being so, we hold that the district court did not abuse its discretion in denying Mr. Palomino Garcia's motion to dismiss the indictment against him.

## III.

In July 1995, a criminal complaint was filed against Mr. Palomino Garcia alleging that he had caused a physical injury to an officer while in police custody. He was charged with aggravated assault under Ariz. Stat. § 13-1204(A)(7). This statute provides that a person commits felony aggravated assault if he assaults someone (as defined by Arizona law) while he is in the custody of a law enforcement agency and has reason to know that the victim of the assault is an

15

employee of that agency acting in an official capacity. Id. § 13-1204(A)(7), (B).

In pertinent part, Arizona law defines assault as "[i]ntentionally, knowingly or recklessly causing any physical injury to another person." Id. § 13-1203(A)(1).

Two months later, Mr. Palomino Garcia pleaded guilty to the aggravated assault charge and was sentenced to 18 months in prison.

Thirteen years later, the district court found Mr. Palomino Garcia guilty of illegally reentering the Untied States in the case now before us. The presentence investigation report ("PSR") recommended a 16-level enhancement based on the determination that Mr. Palomino Garcia had been previously deported following his conviction for aggravated assault, which the PSR concluded was a "crime of violence" under U.S.S.G. § 2L1.2(b)(1)(A)(ii). The district court adopted the PSR's recommendation over Mr. Palomino Garcia's objection. He challenges this determination on appeal.

"We review *de novo* whether a defendant's prior conviction qualifies as a 'crime of violence' under the Sentencing Guidelines." United States v. Harris, 586 F.3d 1283, 1284 (11th Cir. 2009); see also United States v. Wilson, 392 F.3d 1243, 1245 (11th Cir. 2004).

The Guidelines impose a 16-level enhancement if an alien "was deported, or unlawfully remained in the United States, after . . . a conviction for a felony that is

16

. . . a crime of violence." U.S.S.G. § 2L1.2(b)(1)(A)(ii) (Nov. 2007).[9] The version

of the Guidelines under which Mr. Palomino Garcia was sentenced defines a

"crime of violence" as:

> any of the following: murder, manslaughter, kidnapping, aggravated
> assault, forcible sex offenses, statutory rape, sexual abuse of a minor,
> robbery, arson, extortion, extortionate extension of credit, burglary of
> a dwelling, or any offense under federal, state, or local law that has as
> an element the use, attempted use, or threatened use of physical force
> against the person of another.

Id. § 2L1.2 cmt. n.1(B)(iii). This definition is disjunctive and we have held that a

felony conviction qualifies as a crime of violence under § 2L1.2 if either (1) the

defendant was convicted of one of the enumerated offenses; or (2) the use,

attempted use, or threatened use of physical force was an element of the offense.

United States v. Wilson, 392 F.3d 1243, 1246 (11th Cir. 2004); United States v.

Fuentes-Rivera, 323 F.3d 869, 871–72 (11th Cir. 2003).

Here, the district court found that Mr. Palomino Garcia's aggravated assault

conviction qualified as a crime of violence under either test: that is, it qualified

because it was denominated as a conviction for "aggravated assault," which is an

enumerated offense, and because the district court found that the use of physical

---

[9] The Probation Office used the 2007 edition of the Sentencing Guidelines in preparing the PSR. The parties have not contested the applicability of that edition on appeal. For that reason, we also use the 2007 edition.

force was an element of the offense.  Mr. Palomino Garcia argues that both of these determinations were wrong.  As to the first, he contends that the district court based its decision solely on the label the State of Arizona attached to the offense.  He argues this was error because Taylor v. United States, 495 U.S. 575, 110 S. Ct. 2143 (1990), and Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254 (2005), instruct courts to look beyond the label states attach to a crime in determining whether it qualifies as an enumerated offense and to use a "categorical approach" that compares the offense of conviction to a generic, federal version of the enumerated offense.  He says that under the categorical approach, his conviction does not qualify as a crime of violence because the elements of the Arizona aggravated assault statute differ significantly from the elements of a generic aggravated assault.

For the second, Mr. Palomino Garcia argues that the Arizona aggravated assault statute under which he was convicted allowed for a conviction based on mere recklessness.  He says this is insufficient to establish that the "use of physical force" was an element of the offense as required by § 2L1.2.  He argues that because the judicially cognizable record does not establish that he acted with anything more than recklessness, his conviction does not qualify as a crime of violence within the meaning of § 2L1.2.

18

We address each of these arguments in turn.

## A.

It is well settled that a felony conviction for an enumerated offense qualifies as a "crime of violence" under § 2L1.2, whether or not the use of physical force is an element of the crime. See, e.g., United States v. Orduno-Mireles, 405 F.3d 960, 961–62 (11th Cir. 2005) (holding that conviction for burglary of a dwelling was crime of violence under § 2L1.2 because "the definition of 'prior crime of violence' unambiguously includes the burglary of a dwelling"). There is no binding authority in this Circuit on the question of whether a conviction under Arizona's aggravated assault statute, Ariz. Stat. § 13-1204(A)(7), constitutes a "crime of violence" within the meaning of § 2L1.2.

The government says Mr. Palomino Garcia's conviction qualifies as a crime of violence, because if a state uses a label enumerated in § 2L1.2, that crime is *per se* a crime of violence under the Guidelines warranting a 16-level enhancement. Thus, according to the government, because Mr. Palomino Garcia pleaded guilty to "aggravated assault" under Arizona law, and because § 2L1.2 enumerates "aggravated assault" as a "crime of violence," no further inquiry is necessary.

Our analysis of this issue begins with the Supreme Court's decision in Taylor v. United States. In Taylor, the Supreme Court considered whether a

19

defendant's conviction for second degree-burglary under Missouri law qualified as a "violent felony" under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), which the ACCA defines to include "'burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another,'" Taylor, 495 U.S. at 578, 110 S. Ct. at 2147–48 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)).  The Eighth Circuit had concluded that it did and held that the word "burglary" in the ACCA's definition of "violent felony" "'means "burglary" however a state chooses to define it.'" Taylor, 495 U.S. at 579, 110 S. Ct. at 2148 (quoting United States v. Taylor, 864 F.2d 625, 627 (8th Cir. 1989)).  The Supreme Court rejected the Eighth Circuit's approach.  Noting that "the criminal codes of the States define burglary in many different ways," Taylor, 495 U.S. at 580, 110 S. Ct. at 2149, the Court reasoned that Congress could not have intended for sentence enhancements under the ACCA to "depend on the definition adopted by the state of conviction," id. at 590, 110 S. Ct. at 2154.  The Court's analysis continued, "[t]hat would mean that a person convicted of unlawful possession of a firearm would, or would not, receive a sentence enhancement based on exactly the same conduct, depending on whether the State of his prior conviction happened to call that conduct 'burglary.'" Id. at 590–91, 110 S. Ct. at 2154.  To address this problem, the Court concluded that the

20

crime "burglary" in the ACCA's definition of "violent felony" must have "some uniform definition independent of the labels employed by the various States' criminal codes." Id. at 592, 110 S. Ct. at 2155. The Court then looked to the definitions of the crime of burglary adopted in the various states, criminal law treatises, and the Model Penal Code to formulate a generic, contemporary definition of the crime. Id. at 592–99, 110 S. Ct. at 2155–58. The definition arrived at by the Court was, "an unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Id. at 598, 110 S. Ct. at 2158. Thus, the Court concluded that "a person has been convicted of burglary" for purposes of the ACCA only "if he is convicted of a crime, regardless of its exact definition or label, having [these three] basic elements." Id.

Having reached this conclusion, the Court in Taylor was then faced with "the problem of applying this conclusion to cases in which the state statute under which a defendant is convicted varies from the generic definition of 'burglary.'" Id. The Court recognized the "practical difficulties and potential unfairness of a factual approach" in which the sentencing courts would be required to hold a mini-sentencing trial to determine whether the defendant's conduct satisfied the elements of a generic burglary. Id. at 601–02, 110 S. Ct. at 2159–60. Thus, the Court adopted a "formal categorical approach" in which sentencing courts may

21

look only to the "fact of conviction and the statutory definition of the prior offense," as well as any "charging paper and jury instructions" to ascertain whether the offense actually required the elements of a generic burglary. Id. at 602, 110 S. Ct. at 2160.

In Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254 (2005), the Supreme Court "modified" the "categorical approach" it had adopted in Taylor. In Shepard, the Court addressed what information a sentencing court may consider in determining whether a defendant's sentence should be enhanced under the ACCA where the defendant had pleaded guilty to violating a statute that was, based on its categorical terms, broader than the generic offense. The Court held that sentencing courts are "generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" in determining whether the defendant "necessarily admitted" the elements of the generic offense. Id. at 16, 26, 125 S. Ct. at 1257, 1263. The Court concluded it would be improper, however, to rely on police reports or other documents supporting the criminal complaint because a defendant generally does not admit the conduct described in those documents. Id. at 22–23, 125 S. Ct. at 1260–61.

Although <u>Taylor</u> and <u>Shepard</u> were ACCA cases, we have employed their "categorical approach" in determining whether a prior offense qualifies for an enhancement under the Guidelines. <u>See, e.g.</u>, <u>United States v. Archer</u>, 531 F.3d 1347, 1350 (11th Cir. 2008) (citing <u>Taylor</u> and stating: "To determine whether a crime is a 'crime of violence' [under U.S.S.G. § 4B1.2] we use a categorical approach"); <u>United States v. Aguilar-Ortiz</u>, 450 F.3d 1271, 1273–76 & nn.3, 4 (11th Cir. 2006) (explaining that "in determining whether a prior conviction is a qualifying offense for enhancement purposes, we apply a 'categorical' approach" and addressing whether prior state conviction for solicitation constitutes "felony drug trafficking offense" for purposes of § 2L1.2 enhancement); <u>United States v. Krawczak</u>, 331 F.3d 1302, 1306–07 (11th Cir. 2003) (applying <u>Taylor</u> categorical approach to enhancement under § 2L1.2); <u>United States v. Spell</u>, 44 F.3d 936, 939 (11th Cir. 1995) (rejecting government's argument that ACCA cases were not applicable to Guidelines enhancement and holding that <u>Taylor</u>'s "reasoning applies with equal force to decisions under §§ 4B1.1 and 4B1.2").

Our sister circuits have done likewise. They have uniformly rejected the argument advanced by the government here that the label the state happens to attach to the crime of conviction determines whether it is a crime of violence warranting an enhancement under the Guidelines. <u>See</u> <u>United States v. McFalls</u>,

23

592 F.3d 707, 716 (6th Cir. 2010) (construing "aggravated assault" in U.S.S.G. § 4B1.2 definition of "crime of violence," stating: "The Government argues that because Comment 1 to U.S.S.G. § 4B1.2 identifies 'aggravated assault' as a crime of violence, [the crime of "assault and battery of high and aggravated nature"] qualifies categorically as a crime of violence.  This argument fails . . . ."); United States v. Garcia-Caraveo, 586 F.3d 1230, 1233 (10th Cir. 2009) ("To determine whether a particular state's criminal statute falls within the ambit of the term 'crime of violence' under [§ 2L1.2 of] the Guidelines, we look not to how a state has labeled its statute, but rather consider whether the statute corresponds with the 'uniform generic definition' of the crime, using the analytical framework set out in Taylor v. United States."); United States v. De Jesus Ventura, 565 F.3d 870, 875–76 (D.C. Cir. 2009) (applying Taylor and rejecting argument that violation of Virginia "kidnapping" statute is *per se* "crime of violence" under § 2L1.2, stating: "Although Virginia deems any violation of this statute 'kidnapping,' state labels do not control our inquiry under the Guidelines."); United States v. Rodriguez-Guzman, 506 F.3d 738, 744 (9th Cir. 2007) (stating that whether enumerated offense is a "crime of violence" under § 2L1.2 is determined by the federal definition of the offense, "'independent of the labels employed by the various States' criminal codes'" (quoting Taylor, 495 U.S. at 592, 110 S. Ct. at 2155));

24

United States v. Fierro-Reyna, 466 F.3d 324, 327 (5th Cir. 2006) ("We . . . reject the government's contention that Fierro-Reyna's conviction is a crime of violence [under § 2L1.2] merely because Texas categorized the offense as aggravated assault.").

Against this great weight of authority, the government urges us to conclude that the label a state attaches to a prior conviction is dispositive of the "crime of violence" inquiry. We are not persuaded by the government's arguments. First, we reject out-of-hand the government's assertion that we should defer to the happenstance of state labels because attempting to discern a generic definition of the Guidelines' enumerated offenses will be too hard, complicate sentencing proceedings, and give rise to too much litigation. By this argument, the government underestimates the talents and the industry of district judges. A 16-level enhancement under § 2L1.2 frequently corresponds to a Guidelines range that is higher by years than it otherwise would have been.[10] Our courts are neither so indolent nor so divorced from this Nation's foundational principles to jail people for years longer, only because it would be easier to blindly defer to the definitional "vagaries of state law." Taylor, 495 U.S. at 588, 110 S. Ct. at 2153.

---

[10] For Mr. Palomino Garcia, the 16-level enhancement quite possibly increased his Guidelines range by more than four years—from a possible range of 21 to 27 months up to a range of 70 to 87 months, which the district court considered at sentencing.

The government next argues that applying Taylor's categorical approach would be contrary to the Sentencing Commission's intent. The argument is that such an interpretation would ignore the Sentencing Commission's inclusion of the words "'*any* of the following offenses *under federal, state, or local law*,' before its listing of the [enumerated offenses]." Govt. Br. at 44 (emphasis in original). Contrary to the government's argument, however, the words "under federal, state, or local law" *do not appear* before the list of the enumerated offenses in the 2007 version of the Guidelines applied in this case.[11] See U.S.S.G. § 2L1.2 cmt. n.1(B)(iii) (Nov. 2007).

Neither does the addition of those words in 2008 convince us that the Sentencing Commission intended to work a substantive change in the Guidelines' interpretation. The Federal Register notice regarding the 2008 amendments discusses in detail the intent behind three different revisions to § 2L1.2. See Notice of Submission to Congress of Amendments to the Sentencing Guidelines Effective November 1, 2008, 73 Fed. Reg. 26,924, 26,934–35 (May 9, 2008). This included a lengthy discussion of one amendment to the "crime of violence"

---

[11] In fact, those words were added to the Guidelines' definition of "crime of violence" in 2008. Compare U.S.S.G. § 2L1.2 cmt. n.1(B)(iii) (Nov. 2008), with U.S.S.G. § 2L1.2 cmt. n.1(B)(iii) (Nov. 2007). See also Notice of Submission to Congress of Amendments to the Sentencing Guidelines Effective November 1, 2008, 73 Fed. Reg. 26,924, 26,934–35 (May 9, 2008).

definition intended to reject a line of Fifth Circuit cases holding that the term

"forcible sex offense" did not encompass "crimes in which there may be assent in

fact but no legally valid consent." See id. (expressly rejecting the holdings of

United States v. Gomez-Gomez, 493 F.3d 562, 567 (5th Cir. 2007); United States

v. Luciano-Rodriguez, 442 F.3d 320, 322–23 (5th Cir. 2006); and United States v.

Sarmiento-Funes, 374 F.3d 336, 341 (5th Cir. 2004)).  Yet the Sentencing

Commission did not so much as mention the addition of the language the

government relies on.  Given that the practice of deriving generic versions of the

enumerated offenses was firmly rooted in the jurisprudence of courts throughout

the Nation at the time of the 2008 amendments, see supra., we find it

inconceivable that the Sentencing Commission could have intended to work *sub

silentio* such a major change.

   And finally, the government claims that the differing definitions of

aggravated assault—a crime that has its origins in the penal codes of the Several

States rather than the common law—are too varied to be susceptible to a generic

construction.  From our current perspective, we might agree that defining

aggravated assault generically is perhaps more difficult than defining the generic

burglary the Supreme Court addressed in Taylor.  However, we do not agree that a

generic formulation of the crime is either impossible or unwise.  Rather, we

27

believe that employing a generic construction of the aggravated assault offense will further the stated goals of the Sentencing Guidelines by avoiding potential disparities in sentencing as well as the unfairness that would result if the sentence were determined based on nothing more than the label a state happens to attach to a prior crime of conviction.

In sum, we are not persuaded that a prior conviction should qualify as a "crime of violence" under the Guidelines based on the label a state used to describe the offense. Therefore, consistent with our prior precedent and the conclusions of our sister circuits, we apply Taylor's reasoning and hold that the label a state attaches to an offense is not conclusive of whether a prior conviction qualifies as an enumerated offense under § 2L1.2. We reject the government's argument that Mr. Palomino Garcia's conviction qualifies as a "crime of violence" merely because Arizona has labeled it as a conviction for "aggravated assault."

**B.**

Taylor instructs us to determine whether the Arizona aggravated assault statute under which Mr. Palomino Garcia was convicted is equivalent to the generic crime of "aggravated assault" so as to qualify as a "crime of violence" under U.S.S.G. § 2L1.2(b)(1)(A)(ii). To accomplish this task, we must derive the elements of a generic offense of aggravated assault by considering the elements of

28

the crime that are common to most states' definitions of that crime, as well as learned treatises, and the Model Penal Code. See Taylor, 495 U.S. at 598 & n.8, 110 S. Ct. at 2158 & n.8; see also, e.g., McFalls, 592 F.3d at 717 (applying Taylor and defining generic aggravated assault by looking to Model Penal Code and state law); Garcia-Caraveo, 586 F.3d at 1233 ("To determine whether a particular state's criminal statute falls within the ambit of the term 'crime of violence' under the Guidelines, we . . . consider whether the statute corresponds with the 'uniform generic definition' of the crime, using the analytical framework set out in Taylor v. United States. To do so, we examine whether the state's statute 'roughly correspond[s] to the definitions of [the crime] in a majority of the States' criminal codes,' as well as prominent secondary sources, such as criminal law treatises and the Model Penal Code." (quoting Taylor, 495 U.S. at 589, 110 S. Ct. at 2153) (citations omitted)); United States v. Esparaza-Herrera, 557 F.3d 1019, 1023 (9th Cir. 2009) (explaining that "[i]n applying the categorical approach to a 'traditional crime' such as aggravated assault, we derive the crime's uniform meaning from the generic, contemporary meaning employed by most states, guided by scholarly commentary," and the Model Penal Code, which "serves as an aid in determining an offense's generic meaning." (internal quotations and alterations omitted)); United States v. Ramirez, 557 F.3d 200, 206 (5th Cir. 2009) ("Our primary source

29

for the generic contemporary meaning of aggravated assault is the Model Penal Code. For other sources of generic contemporary meaning, this court may consider, inter alia, Professors LaFave and Scott's treatise, modern state cases, and dictionaries." (citations and quotations omitted)).

We have never considered what elements a generic aggravated assault might contain. The Fifth, Sixth, and Ninth Circuits have each addressed the question, however, and we find their decisions instructive. After considering the Model Penal Code's definition of aggravated assault, consulting treatises, and surveying state law, these courts have held that the generic aggravated assault offense involves, at a minimum, the aggravating factors of either serious bodily injury to the victim or the use of a deadly weapon. See McFalls, 592 F.3d at 717 (adopting Model Penal Code definition requiring serious bodily injury or use of a deadly weapon, noting that this "definition approximates the definition of 'aggravated assault' used by several states that have consolidated the crimes of assault and battery"); Esparaza-Herrera, 557 F.3d at 1024–25 (applying Model Penal Code definition and definition used by majority of states and holding that conviction under Arizona aggravated assault statute was not "crime of violence" because it allowed for conviction based on mere recklessness); United States v. Fierro-Reyna, 466 F.3d 324, 327–29 (5th Cir. 2006) (considering the Model Penal Code;

2 Wayne R. LaFave, Substantive Criminal Law § 16.2(d) (2d ed. 2003); and

various state statutes and concluding that "the generic, contemporary meaning of

aggravated assault involves aggravating factors such as use of a deadly weapon

and causation of serious bodily injury").[12]

This definition closely tracks the Model Penal Code's definition of

aggravated assault, which provides:

> A person is guilty of aggravated assault if he: (a) attempts to cause
> serious bodily injury to another, or causes such injury purposely,
> knowingly or recklessly under circumstances manifesting extreme
> indifference to the value of human life; or (b) attempts to cause or
> purposely or knowingly causes bodily injury to another with a deadly
> weapon.

Model Penal Code § 211.1(2)(a)–(b).  As the Fifth Circuit also explained, it is at

the same time consistent with the discussion of aggravated assault in Professor

LaFave's treatise on criminal law, which "focuses . . . on the two most common

aggravating factors: the means used to commit the crime, such as use of a deadly

weapon, and the consequences of the crime, such as serious bodily injury."

Fierro-Reyna, 466 F.3d at 328 (citing 2 LaFave, Substantive Criminal Law §

---

[12] The Tenth Circuit has also held in an unpublished decision that the generic offense of aggravated assault under § 2L1.2 "is an offense that has as an element either the causing of serious bodily injury or the use of a dangerous weapon."  United States v. Gastelum-Laurean, No. 09-1343, 2010 WL 1242804, at *3 (10th Cir. Apr. 1, 2010).  We note that in that case, the government conceded that the district court erred because it failed to analyze the defendant's prior conviction under the categorical approach using this definition.  See id.

16.2(d)). And it is consistent with the dictionary definition of aggravated assault, which Black's Law Dictionary defines as "[c]riminal assault accompanied by circumstances that make it more severe, such as the intent to commit another crime or the intent to cause serious bodily injury, esp[ecially] by using a deadly weapon." Black's Law Dictionary 122 (8th ed. 2004).

We find these authorities persuasive. Drawing from all of this, we hold that the generic offense of "aggravated assault" under § 2L1.2 of the Guidelines involves a criminal assault accompanied by the aggravating factors of either the intent to cause serious bodily injury to the victim or the use of a deadly weapon.

The Arizona statute under which Mr. Palomino Garcia was convicted provides that a "person commits aggravated assault if such person commits assault as defined in section 13-1203 . . . [while] in the custody of . . . a law enforcement agency . . . and [the person] commits the assault knowing or having reason to know the victim is an employee of such . . . agency . . . acting in an official capacity." Ariz. Stat. § 13-1204(A)(7) (1995). "Assault" is in turn defined as "[i]ntentionally, knowingly or recklessly causing any physical injury to another person." Id. § 13-1203(A)(1). The Arizona aggravated assault statute does not

32

require either serious bodily injury or the use of a deadly weapon.[13]  See id.

(prohibiting the causation of "*any* physical injury" (emphasis added)); State v.

Harrison, 985 P.2d 513, 516 (Ariz. Ct. App. 1998) (affirming conviction for

aggravated assault under Ariz. Stat. § 13-1204 where law enforcement officers

sustained "minor physical injuries").  Rather, it requires only a simple assault with

the sole aggravating factor being the victim's status as a law enforcement officer.

In Fierro-Reyna, the Fifth Circuit considered whether the victim's identity

as a police officer was sufficient to bring a defendant's prior state conviction for

aggravated assault within the generic definition of aggravated assault.  Mr. Fierro-

Reyna had been convicted of aggravated assault under a Texas statute that, like the

Arizona aggravated assault statute at issue here, provided that "'[a] person

commits an offense if he commits assault . . . if he . . . causes bodily injury to a

peace officer in the lawful discharge of official duty when he knows or has been

informed the person assaulted is a peace officer.'"  Fierro-Reyna, 466 F.3d at 326

(quoting Tex. Penal Code § 22.02(a)(2) (1974)).  The Fifth Circuit first explained

that neither the Model Penal Code, LaFave's criminal law treatise, nor Black's

-----

[13] Notably, the first two aggravating factors under Arizona's aggravated assault statute are "serious physical injury to another" and use of "a deadly weapon or dangerous instrument." Ariz. Stat. § 13-1204(A)(1)–(2) (1995).  It is undisputed that Mr. Palomino Garcia was not charged or convicted of violating either of these provisions.

33

Law Dictionary considered the victim's identity as a police officer to be part of the generic contemporary definition of aggravated assault. Id. at 327–28. The court then undertook an extensive survey of state law and determined that only seven states, Arizona being one, allowed for a simple assault to be converted into an aggravated assault based on the victim's status as a police officer. Id. at 328–29. The court concluded that against the nearly uniform definitions of aggravated assault in the "Model Penal Code, dictionary definitions, and the criminal codes of the majority of states," this "small minority of states" that define aggravated assault as a simple assault on a police officer was not sufficient to bring such an assault within the contemporary generic definition of the offense. Id. at 329 & n.8. Thus, the Fifth Circuit held:

> [T]he generic, contemporary meaning of aggravated assault involves aggravating factors such as use of a deadly weapon and causation of serious bodily injury and does not include considerations regarding the victim's status as a police officer.
>
> Because the statutory section under which Fierro-Reyna was convicted prohibits behavior that is not within the generic, contemporary meaning of aggravated assault as it is used in U.S.S.G. § 2L1.2, his conviction does not qualify as a crime of violence, so his sentence was improperly enhanced by sixteen levels.

Id. at 329–30.

34

As with the Texas statute at issue in <u>Fierro-Reyna</u>, the Arizona aggravated

assault statute under which Mr. Palomino Garcia was convicted prohibits a simple

assault on a law enforcement officer. It does not require either the use of a deadly

weapon or the intent to cause serious bodily injury, which are necessary elements

of the contemporary, generic offense of aggravated assault as that term is used in

§ 2L1.2. Therefore, the elements of aggravated assault under Ariz. Stat. § 13-

1204(A)(7) (1995) do not substantially correspond to the elements of the generic

offense of aggravated assault. That being the case, we hold that Mr. Palomino

Garcia's conviction for aggravated assault under Ariz. Stat. § 13-1204(A)(7)

(1995) is not per se a "crime of violence" under U.S.S.G. § 2L1.2(b)(1)(A)(ii).[14]

## C.

Because Mr. Palomino Garcia's prior felony conviction does not qualify as

a conviction for the enumerated offense of aggravated assault, we must next

consider whether it nonetheless qualifies as a "crime of violence" under § 2L1.2

because it "has as an element the use, attempted use, or threatened use of physical

---

[14] Because we conclude that this section of Arizona's aggravated assault statute is not consistent with the generic offense of aggravated assault, we need not consider Mr. Palomino Garcia's alternative argument that the generic offense of aggravated assault requires a mental state greater than mere recklessness. <u>Compare</u> <u>McFalls</u>, 592 F.3d at 717 (aggravated assault based on recklessness inconsistent with generic definition of offense); <u>Esparaza-Herrera</u>, 557 F.3d at 1024–25 (same), <u>with</u> <u>United States v. Fungia-Portillo</u>, 484 F.3d 813, 816–17 (5th Cir. 2007) (aggravated assault based on recklessness sufficient to meet generic definition).

35

force." See U.S.S.G. § 2L1.2 cmt. n.1(B)(iii); Wilson, 392 F.3d at 1246; Fuentes-Rivera, 323 F.3d at 871–72. The district court concluded that it qualified as a "crime of violence" for this reason as well, finding that because Mr. Palomino Garcia was charged with causing an injury to a law enforcement officer, his prior conviction necessarily involved the "use of physical force" against another.

Mr. Palomino Garcia argues that this was error because the Arizona aggravated assault statute under which he was convicted permits a conviction where the physical injury is caused by the defendant's recklessness. Relying on the Supreme Court's decision Leocal v. Ashcroft, 543 U.S. 1, 125 S. Ct. 377 (2004), and decisions from other circuits, he contends that a conviction based on recklessness is not an offense having as an element the "use of physical force" because it does not require the active, intentional employment of force against another.

We have not considered whether a crime with a *mens rea* of recklessness satisfies the "use of physical force" requirement so as to be classified as a crime of violence under § 2L1.2.

In Leocal, the Supreme Court considered whether a conviction under a Florida drunk driving statute qualified as a "crime of violence" under 18 U.S.C. § 16. 543 U.S. at 3–4, 125 S. Ct. at 379. Like the definition of "crime of violence"

36

under § 2L1.2, the federal statute defined a crime of violence, in pertinent part, as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a). The Court concluded that Florida's statute did not meet 18 U.S.C. § 16's "use of physical force" requirement because an individual could be convicted under the statute for negligent or accidental conduct. Leocal, 543 U.S. at 11, 125 S. Ct. at 383. Noting that a crime of violence must be one that involves the "use . . . of physical force," the Court observed that "'use' requires active employment." Id. at 9, 125 S. Ct. at 382 (alteration in original). The Court explained:

> While one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident. Thus a person would "use . . . physical force against" another when pushing him; however, we would not ordinarily say a person "use[s] . . . physical force against" another by stumbling and falling into him.

Id. (alterations in original). The Court concluded that the "use . . . of physical force against the person or property of another [ ] most naturally suggests a higher degree of intent than negligent or merely accidental conduct." Id. Thus, the Court held that the offense of causing an injury while driving intoxicated was not a crime of violence because it did not require the offender to actively employ force against the person or property of another. Id. at 13, 125 S. Ct. at 384.

37

The Court in <u>Leocal</u> expressly did not address whether "proof of the reckless use of force against a person or property of another qualifies as crime of violence." <u>Id.</u> Since <u>Leocal</u>, a number of circuit courts have applied its reasoning. Both in the context of 18 U.S.C. § 16 and the almost identically worded definition of "crime of violence" under § 2L1.2 of the Guidelines, these courts have held that crimes with a *mens rea* of recklessness are not "crimes of violence." For example, the Third Circuit interpreted <u>Leocal</u> to require more than recklessness in <u>Oyebanji v. Gonzales</u>, 418 F.3d 260 (3d Cir. 2005). In an opinion authored by then-Judge Alito, the court explained that it "[could not] overlook the [<u>Leocal</u>] Court's repeated statement that 'accidental' conduct (which would seem to include reckless conduct) is not enough to qualify as a crime of violence." <u>Id.</u> at 264. Thus, the court held that a conviction for vehicular homicide, which required proof of only reckless conduct, was not a crime of violence under § 16.[15] <u>Id.</u> at 264–65. The Fourth Circuit reached the same conclusion, observing that the Court's reasoning in <u>Leocal</u> "strongly indicates that the result . . . would have been the same even had the statute there at issue required recklessness rather than mere negligence." <u>Bejarano-Urrutia v. Gonzales</u>, 413 F.3d 444, 447 (4th Cir. 2005)

---

[15] The Third Circuit applied the same reasoning to conclude that a Pennsylvania assault violation that required a minimum *mens rea* of recklessness is not a crime of violence under § 2L1.2. <u>See</u> <u>United States v. Otero,</u> 502 F.3d 335 (3d Cir. 2007).

(holding that conviction for involuntary manslaughter was not a crime of violence under § 16); see also Garcia v. Gonzales, 455 F.3d 465, 469 (4th Cir. 2006) (reckless assault is not "crime of violence" under § 16(a) because it "does not contain an element that there be the intentional employment of physical force").

Other circuits agree and have also held that, under Leocal, recklessness does not satisfy the "use of physical force" requirement under § 16 or § 2L1.2. See United States v. Zuniga-Soto, 527 F.3d 1110, 1124 (10th Cir. 2008) ("[W]e are convinced that recklessness falls into the category of accidental conduct that the Leocal Court described as failing to satisfy the use of physical force requirement under . . . § 16's definition[] of 'crime of violence.' We therefore hold that a *mens rea* of recklessness does not satisfy [the] use of physical force requirement of under § 2L1.2's definition of 'crime of violence.'" (citation omitted)); United States v. Torres-Villalobos, 487 F.3d 607, 616 (8th Cir. 2007) (holding that "the 'use of force,' as Leocal interpreted that phrase, is not an element of a second-degree manslaughter conviction" under § 16 because the statute could be satisfied by a *mens rea* of recklessness); United States v. Portella, 469 F.3d 496, 499 (6th Cir. 2006) ("We . . . hold that a crime requiring only recklessness does not qualify as a 'crime of violence' under 18 U.S.C. § 16. Because the catch-all clause of U.S.S.G. § 2L1.2(b)(1) uses identical language, [a] conviction for reckless

39

vehicular manslaughter is not a 'crime of violence' under that clause . . . .");

Fernandez-Ruiz v. Gonzales, 466 F.3d 1121, 1130 (9th Cir. 2006) (en banc)

("[T]he reckless use of force is 'accidental' and crimes of recklessness cannot be

violence [under § 16].").

In light of Leocal and the persuasive reasoning of our sister circuits, we too

are convinced that a conviction predicated on a *mens rea* of recklessness does not

satisfy the "use of physical force" requirement under § 2L1.2's definition of

"crime of violence."[16]  Because Arizona law defines recklessness as nothing more

than the conscious disregard of a substantial and unjustifiable risk, see Ariz. Stat.

§ 13-105(c) (1995), this is more akin to negligence and cannot be said to require

the *intentional* use of force, see Fernandez-Ruiz, 466 F.3d at 1130; In re William

G., 963 P.2d 287, 292 & n.1 (Ariz. Ct. App. 1997) (explaining that "reckless

conduct is a species of unintentional conduct" and that "[t]he difference between"

recklessness and criminal negligence "is that criminal negligence requires only a

---

[16] Given the near unanimity of the circuit courts on this issue, it is perhaps not surprising that the government cites no authority supporting its position that a conviction based on recklessness satisfies the "use of physical force" requirement under § 2L1.2.  Instead, the government merely asserts that the mental state of recklessness is different from the mental state at issue in Leocal, and thus we should decline to follow it here.  The government's observation that Leocal did not address a conviction predicated on recklessness is no doubt correct.  It is also of little help.  This insight does nothing to address the reasoning of Leocal, which plainly suggests that crimes requiring only a recklessness disregard for the risk of physical injury to others are not crimes of violence.

failure to perceive a risk, as compared to the recklessness requirement of an awareness and conscious disregard of the risk"). Accordingly, we hold that a conviction under Ariz. Stat. § 13-1204(A)(7) (1995) predicated on the reckless causation of physical injury does not qualify as a crime of violence under § 2L1.2.

**D.**

In this case, Mr. Palomino Garcia was convicted of "[i]ntentionally, knowingly or recklessly causing any physical injury to" a law enforcement officer while in custody. Thus, it is possible that Mr. Palomino Garcia committed his offense "intentionally," "knowingly," or "recklessly." The first two of these mental states may satisfy the "use of physical force" requirement, while the third does not.

Generally, we apply Taylor's categorical approach in determining whether a prior conviction is a qualifying offense for sentencing enhancement purposes. This means that we usually look no further than the statute and judgment of conviction. United States v. Aguilar-Ortiz, 450 F.3d 1271, 1274 (11th Cir. 2006). However, when the law under which a defendant has been convicted contains different statutory phrases—some of which require the use of force and some of which do not—the judgment is ambiguous and we apply a "modified categorical approach." See United States v. Johnson, ___ U.S. ___, 130 S. Ct. 1265, 1273

41

(2010); Aguilar-Ortiz, 450 F.3d at 1274. Under this approach, a court may determine which statutory phrase was the basis for the conviction by consulting a narrow universe of "Shepard documents" that includes any charging documents, the written plea agreement, the transcript of the plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented. See Johnson, ___ U.S. at ___, 130 S. Ct. at 1273; Shepard, 544 U.S. at 16, 26, 125 S. Ct. at 1257, 1263; Aguilar-Ortiz, 450 F.3d at 1274.

In most cases where the statute and judgment of conviction are ambiguous, and thus, it is impossible to determine that a prior conviction is a qualifying offense under the Guidelines, we remand for the district court to consider whether the facts underlying the state conviction set out in the Shepard documents establish that the conviction qualifies for the enhancement. See Aguilar-Ortiz, 450 F.3d at 1273–74. But we see no reason to remand in this case. The government has never disputed (either before the district court or on appeal) Mr. Palomino Garcia's contention that the Shepard documents do not establish that he committed his assault either intentionally or knowingly. Instead, the government's position was and continues to be that a physical injury to the victim necessarily demonstrates his offense involved the use of physical force. As we have seen, however, this is not always so. A physical injury resulting from reckless conduct

42

does not require the "use of physical force" for purposes of § 2L1.2. Because the government has not demonstrated that his Arizona aggravated assault conviction was the result of intentional or knowing conduct so as to qualify as a "crime of violence" under U.S.S.G. § 2L1.2, we hold that the district court erroneously enhanced Mr. Palomino Garcia's sentence by 16 levels.

## IV.

We have concluded that Mr. Palomino Garcia's Arizona aggravated assault conviction does not qualify as a "crime of violence" within the meaning of U.S.S.G. § 2L1.2, and that the district court erroneously applied a 16-level enhancement. This being the case, his sentence is procedurally unreasonable, and we need not address whether the district court's 70-month sentence was substantively unreasonable. See, e.g., United States v. Bonilla, 579 F.3d 1233, 1245 (11th Cir. 2009) (explaining that an error in the Guidelines calculation renders a sentence procedurally unreasonable and thus an abuse of discretion).

## V.

In his final enumeration of error, Mr. Palomino Garcia argues that his sentence violates his rights under the Fifth and Sixth Amendments because the prior felony conviction, which served as the basis for his enhancement under § 2L1.2, was neither alleged in his indictment nor proved to a jury. "This contention

is barred by <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 226–27, 118 S. Ct. 1219, 1222, 140 L. Ed. 2d 350 (1998), which we have repeatedly held remains the law until the Supreme Court overrules it." <u>United States v. Wade</u>, 458 F.3d 1273, 1278 (11th Cir. 2006) (collecting cases).  Accordingly, this claim lacks merit.

## VI.

For the reasons we have stated, we hold that the district court did not err in denying Mr. Palomino Garcia's motion to dismiss his indictment on statute of limitations grounds.  His conviction is therefore affirmed.  However, the district court erroneously applied a 16-level enhancement because his prior aggravated assault conviction does not qualify as a "crime of violence" under U.S.S.G. § 2L1.2.  Accordingly, we reverse his sentence and remand for resentencing consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.